IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| DAN ALLEN, BOBBY WATKINS and ALBERTA LEE ) ) ) Plaintiffs, ) ) vs. ) ) CITY OF EVERGREEN, ALABAMA; ) PETE WOLFF, III, Mayor of the City of ) Evergreen, Alabama; LUTHER UPTON, ) DIANE SKIPPER, JOHN SKINNER, JR., ) VIVIAN FOUNTAIN, and MAXINE ) HARRIS Council Members of the City ) of Evergreen, Alabama; BECKY B. ) ROBINSON, City Clerk for the City of ) Evergreen, Alabama ) ) Defendants. ) | Case Nos.: 1:12-cv-00496—CG-M |

**BRIEF OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR COURT-ORDERED REDISTRICTING PLAN**

Plaintiffs respectfully move this Court for entry of the accompanying plan of single-member districts for elections of the City Council of the Defendant City of Evergreen (hereinafter, "Defendant"). As set forth herein, Plaintiffs brought this action challenging both the current (2001) and proposed (2012) redistricting plans for Defendant under Sections 2 and 5 of the Voting Rights Act and the 14th and 15th Amendments based on claims of racial discrimination and mal-apportionment.[1] As the parties previously have agreed and as this Court

---

[1] Plaintiffs also brought a claim that Defendant had adopted a racially discriminatory system for determining who would be eligible to vote in Defendant's municipal elections. That claim was addressed by the injunction of the discriminatory system and the appointment of a special master to oversee development of a list of eligible voters and with the full statutory and customary authority of officials of the City of Evergreen to supervise the conduct of the December 15, 2012

has found, "[t]he 2010 census established that the city council districts in place since 2001 are mal-apportioned so that their continued use for elections would violate the 14th Amendment." Dkt. 8 at 3. The parties agreed and this Court further ordered that the redistricting plan was a voting change subject to Section 5 that was unenforceable unless and until Section 5 preclearance was obtained;[2] and the Court enjoined use of the plan. Id. at 5-6. The Court enjoined the August 28, 2012 elections and initially ordered that a municipal election be held on December 15, 2012. Id. The parties since have determined, as set forth in their December 10, 2012 Joint Motion, that the December date has proved unrealistic in light of unanticipated problems with the voter registration list and because the parties have not agreed on a plan for new council districts. Dkt. 17. The parties accordingly have filed a Joint Motion to move the election date to February 26, 2013 in anticipation of the Court's resolution of the instant dispute over which redistricting plan to use in the new election. Id. The parties thus have agreed that it has become the "unwelcome obligation" of this Court to order into effect a districting plan that comports with the laws and Constitution of the United States. *Connor v. Finch*, 431 U.S. 407, 415 (1977).

As set forth in detail herein, the law could not be plainer: Defendants cannot implement and this Court cannot countenance use of that plan absent Section 5 preclearance: *Clark v. Roemer*, 500 U.S. 649 (1991); 28 C.F.R.51.10. Plaintiffs' plan, on the other hand, fully satisfies all legal standards and should be ordered into effect by this Court.

---

special election and any subsequent run-off election. (Doc.13 at 4). The Special Master currently is conducting his duties.
[2] Section 5 prohibits the enactment or administration of any change affecting voting by jurisdictions in Alabama, among others, unless the change is "precleared" either through a declaratory judgment by the United States district Court for the district of Columbia that the change is free of any racially discriminatory purpose or effect, or through an administrative determination to that effect by the Attorney General. 42 U.SC. 1973c.

## PROCEDURAL HISTORY

Plaintiffs filed this action on August 6, 2012 to challenge each of the following: the districting plan for elections of the Evergreen, Alabama, city council in use since 2001; Defendant's proposed 2012 redistricting plan; and a newly-adopted system of determining voter eligibility and preparation of the list of eligible voters for city elections. Dkt. 1. Plaintiffs challenged both of these plans and the voter eligibility procedure as racially discriminatory in violation of Sections 2 and 5 of the Voting Rights Act of 1965, as amended, 42 U.S.C. 1973 and 1973c (Section 5") and the 14th and 15th Amendments.  Id.

Defendants adopted a redistricting plan on May 15, 2012 and submitted that plan to the Attorney General for Section 5 review, and the Attorney General received it on June 15, 2012.[3] *Plaintiffs' Exhibit 1.*  Although Section 5 plainly prohibited implementation of the new plan absent preclearance, Defendants already had taken "irretrievable steps to conduct the August 28, 2012 City of Evergreen municipal elections based on the unprecleared voting changes, including the redistricting plan and new voter eligibility system." Dkt. 8 at 5

On August 10, 2012 the Attorney General sent a letter formally denying preclearance and identifying in detail the additional information necessary for Defendants to overcome evidence of racial discrimination in the adoption of the plan. *Plaintiffs' Exhibit 2.*

---

[3]  Section 5 provides that a jurisdiction may seek a declaratory judgment from the United States District Court for the District of Columbia that the proposed voting change was a not adopted with a racially discriminatory purpose and would not have a racially discriminatory effect; or, as here, the jurisdiction may seek such a determination administratively from the Attorney General. 42 U.S.C. 1973c.

Defendants have not submitted additional information to the Department of Justice. Instead, they have determined to pursue the redistricting plan enjoined by this Court notwithstanding the lack of preclearance. *Plaintiffs' Exhibit 2;* Dkt. 17.

The parties have agreed that a new election date must now be ordered by the Court and that the Court should select a plan of single-member districts under which that election should be held. Dkt. 17.

## STATEMENT OF FACTS

Evergreen is the county seat and principal city of Conecuh County, and is governed by a mayor and five city council members elected from single-member districts. Dkt. 8, p. 3. Between 2000 and 2010, the population of Evergreen shifted considerably. The black share of the city's population increased from 52.8 percent in 2000 to 62.4 percent in 2010. *Plaintiffs' Exhibits 3 and 4.* The city's black population is heavily concentrated in the southern and western portions of the city. *Plaintiffs' Exhibit 5.* The concentration of black population within Evergreen is such that it is possible to draw three compact and contiguous city council districts with black majorities in excess of 65 percent. *Attachment A.*

The shifts in population from 2000 to 2010 left the 2001 city council districts mal-apportioned in terms of population to the particular disadvantage of the black community, as the area covered by the two overwhelmingly black districts had a net overpopulation. *Plaintiffs' Exhibit 1.* Although the 2010 census showed a 62.4 percent black majority in Evergreen, as a realistic matter the 2001 plan provided for three districts with effective white majorities: Districts 2 and 3 have substantial white majorities, and district 4 and 5 are overwhelmingly black in population, while a third district (District 1) was 51.0 percent black in voting age population.

4

Id.  White persons, however, comprise a majority of the registered voters who reside in District 1, and white candidates consistently have carried the district.  ***Plaintiffs' Exhibits 5 and 6***.

Defendants drew new council districts and also adopted a new procedure for determining which registered voters reside within the City of Evergreen.  "As in other Alabama cities, in Evergreen the past procedure has been to include all Conecuh County registered voters whose registration reflects an addresses within the city limits: such persons comprise the list of eligible voters for municipal elections. For 2012, the City adopted a new procedure."  Dkt. 13, p 2.  Defendants prepared two separate and unequal lists of registered voters and did so starting not with the county voter registration list but with the city utility list and/or the E-911 list and placed those and only those voters in whose names municipal utilities were billed on the municipal registered voter list for the 2012 elections.  Dkt. 8 pp. 3-4; ***Plaintiffs Exhibit 6.***  Hundreds of other persons who were registered voters in the county and had city addresses but who were not named municipal utility customers or named on the E-911 list were placed on a separate list of "Problem Voters."  Id.  The list of Problem Voters disproportionately included black voters. ***Id.*** Defendants also purged voters based solely on rumor and supposition so that registered voters with city addresses were removed entirely from both voter lists***.  Plaintiffs' Exhibit 6.***

The 2012 redistricting plan adopted by Defendants continued the packing of black population into two of the city's five council districts (4 and 5), both of which exceeded 85 percent in black population.  District 1 remained unchanged at 51.0 percent black in voting age population***, Plaintiffs' Exhibit 1***  and with a white voter registration majority of 227 to 201***. Plaintiffs' Exhibit 6.***  The proposed plan fragmented the concentrated black population concentration.  Compare ***Plaintiffs' Exhibit 1*** and ***Plaintiffs' Exhibit***  4.

Defendants' plan also left District 5 (83.75% black) overpopulated by 6.34 percent, or well in excess of the plus or minus five percent limitation normally used in redistricting. ***Plaintiffs' Exhibit 1,***. The overpopulation of District 5 would operate to the particular disadvantage of the geographic area of the city's core black concentration and to the undervaluing of the votes of the citizens of that area. *See Larios v. Cox*, 300 F. Supp.2d 1320 (N.D. Ga. 2004) *aff'd* 542 U.S. 947 (2004).

Overpopulated District 5, moreover, is adjacent to the plan's most under-populated district, District 1. Id. A transfer of the excess black population in district 5 to district 1 would have undermined or eliminated the white voter registration majority in district 1.

Voting in Evergreen is racially polarized. City election returns for 2004 and 2008 show that the predominantly white districts/precincts gave large majorities to the white candidates for mayor against the black candidates, while the predominantly black precincts delivered large majorities for the black candidate of choice***. Plaintiffs' Exhibit 5***. The election returns also demonstrate that District 1, although 51 percent black in voting age population, is controlled by white voters:  amid racially polarized voting, the black mayoral candidate lost in district 1 in 2004 and in the 2008 primary and run-off; and the black candidate for city council lost to his white opponent in 2004. Id. Thus, within district 1 the choice of white voters has prevailed in every municipal election.

Voting also continues to be racially polarized in state and federal elections. ***Plaintiffs' Exhibit 9***  Among Conecuh County precincts that include major parts of Evergreen, just as in municipal elections, the predominantly white precinct delivers large majorities against black candidates in contests between black and white candidates, while the predominantly black precincts deliver large majorities for the black candidates***. Id. .***

6

Black citizens of Evergreen continue to bear the effects of discrimination in such areas as housing, education, employment and income, which hinder their ability to participate effectively in the political process. ***Plaintiffs' Exhibits 17 and 18.*** The mean per capita annual income of black residents ($8,496) is less than 40 percent of that of white residents ($21,275), and black residents are at a similar disadvantage in home ownership and value of home, proportion of income devoted to mortgage or rent payments, and educational attainment. Id. .

Alabama has a long history of racial discrimination in voting. *See, e.g*; *Hunter v. Underwood,* 471 U.S. 222, (1985); *Gomillion v. Lightfoot,* 364 U.S. 339 (1960); *Harris v. Siegelman,* 695 F.Supp. 517 (M.D.Ala.1988); *Dillard v. Crenshaw County,* 640 F.Supp. 1347 (M.D.Ala.1986); *Buskey v. Oliver,* 565 F.Supp. 1473 (M.D.Ala.1983); *United States v. Alabama,* 252 F.Supp. 95 (M.D.Ala.1966); *Sims v. Baggett,* 247 F.Supp. 96 (M.D.Ala.1965) (per curiam); Evergreen and Conecuh County share in that history. ***Plaintiffs Exhibit 8.*** . Indeed, discrimination against black voters at the polls in Conecuh County prompted suit before *Harris v. Graddick*, 593 F.Supp. 128, 137 n. 10 (1986), based on truly appalling conduct by white poll workers. *See* Weinberg and Utrech, *Problems In America's Polling Places: How They Can Be Stopped*, 11 Temp. Pol. &Civ. Rts. L. Rev. 401, 408-410, 440-441. Attorneys General have found it necessary to assign federal observers to monitor elections in Conecuh County 13 times since 1980, including as recently as 2006, which is more than any other county in Alabama during that period except for Dallas County (Selma), which also had 13 elections monitored by federal observers.[4] In the 2008 municipal election involving a contest between black and white candidates for mayor, white men in pick-up trucks stationed themselves outside each polling place and filmed black voters as they went to the polls in what was taken as an effort to deter and

---

[4] These figures are from the web site http://www.lawyerscommittee.org/projects/section_5/.

intimidate the black voters. ***Plaintiffs' Exhibit 8.***

The city and county have a clear pattern of moving forcefully to thwart each prospective gain for minority voters. After the 1965 passage of the Voting Rights Act and the enfranchisement of black voters, the first black candidates for office emerged in 1970. ***Plaintiffs Exhibit 10.*** The county promptly changed the method of electing both the Board of Directors (the county governing body, now "county commissioners"), and the County Democratic Executive Committee, the body which selected polling place officials for county elections to a multi-member district system that submerged the votes of majority-black areas. ***Id.***

The county failed to submit either of these voting changes for Section 5 review until the Department notified local officials of the need for preclearance, and on September 14, 1981, the Attorney General interposed an objection to the change for the county commission, noting that at the time of the change, that

> …minorities who were becoming active politically as a result of increased registration following the enactment o the Voting Rights Act of 1965 constituted a majority in one of the single-member districts. … The change has submerged into larger multi-member districts sizeable black concentrations so as to dilute the minority voting strength that those voters would have enjoyed under a continued single-member district plan. These circumstances, in the context of the racially polarized voting patterns that seem to exist in Conecuh County, raise at least an inference of a proscribed racially discriminatory purpose.

Id.

A similar objection was interposed to the change in method of election for members of the Conecuh County Democratic Executive Committee on April 23, 1982. ***Plaintiffs' Exhibit 11.*** There, the county had changed from election by individual voting precincts, many of which had emerging black majorities, to election in two large multi-member districts each of which had a substantial white voting majority. *Id*. Local citizens filed suit to enforce the objections and

8

obtain fairly apportioned election systems. Id. The county subsequently adopted a single-member district plan and submitted that plan for Section 5 review on July 21, 1982. ***Plaintiffs Exhibit 12.*** On July 26, 1982, the Attorney General interposed an objection to the county's proposed redistricting plan, noting the "high level of racial bloc voting in the county," and that the county's proposed plan failed to contain a single black majority district despite the heavy concentration in and adjacent to the City of Evergreen, which the county's plan had needlessly fragmented; the letter also specifically admonished the county against "packing" minorities into a district. *Id.*

As found by this Court, the City of Evergreen violated Section 5 of the Voting Rights Act by enforcing the voting changes raised in this action. Dkt. 8. The process of adoption of those changes, moreover, was conducted without meaningful participation by the black community: there was no public notice or council authorization for the change in method of determining which city residents would be eligible to vote in the 2012 election and black citizens sought in vain changes in district boundaries which would give them a more equal opportunity to elect candidates of their choice. ***Plaintiffs Exhibits 6 & 8.***

Defendants' submission of the plan on June 15, 2012 meant that the 60-day period for the Attorney General's Section 5 determination, 42 U.S.C. 1973c, would not occur until mid-August, or well after the deadline for numerous steps in the election process, including the deadline for candidates to qualify for council positions, Ala. Code §11-46-25(g) (1975). Despite the tardiness of Defendants' submission, Defendants did not request expedited consideration of the 2012 Plan. ***Plaintiffs' Exhibit 1***. Defendants' submission also did not include information identified by the Attorney General in his redistricting guidance as important to the review of redistricting plans, including "public statements of members of the adopting body or other who

may have played a significant role in the process, the historical background of the decision; … the sequence of events leading up to the decision; ... whether the challenged decision departs, either procedurally or substantively, from the normal practice; and contemporaneous statements and viewpoints held by the decision-makers, elections history and voting patterns within the jurisdiction, voter registration and turnout information; plans that were actually considered or drawn by the submitting jurisdiction, as well as alternative plans presented or made known to the submitting jurisdiction by interested citizens." Id., Attorney General's Guidance Concerning Redistricting Under Section 5, 76 F. Reg. Vol. 76 No. 27, pp. 7470-7473.  Each of these items tracks the racial purpose analysis of *Village of Arlington Heights* v. *Metropolitan Housing Development Corp.,* 429 U.S. 252, 266-68 (1977), and they are the core elements of the Attorney General's request for additional information.  ***Plaintiffs'Exhibit 2.***

These facts provide the context for the adoption of Defendants' redistricting plan, and the context for the Court's decision of the contours of a court redistricting plan for the February 26, 2013 election.

## ARGUMENT

### A.  Defendants' 2012 Redistricting Plan Cannot be Used Absent Preclearance

As noted above at note 2, a voting change is legally unenforceable until "preclearance" is obtained.  42 U.S.C. 1973c.  In order to obtain preclearance, a jurisdiction bears the burden of proof that the proposed plan would not retrogress minority political participation and electoral opportunities, and also that the change was adopted free of any racially discriminatory purpose. Id.  Congress has mandated centralized review of voting changes: a jurisdiction subject to Section 5 can either seek a declaratory judgment from the United States District Court for the

District of Columbia that its change is free of discrimination, or it can seek administrative review by the Attorney General.  Id.

This Court accordingly has enjoined use of the plan because it has not gained preclearance.  That decision is, of course, the law of the case.  *City of Pleasant Grove v. United States*, 638 F. Supp. 782, 783 (1985).  This Court's action also follows the clear command of the Supreme Court that an unprecleared plan never should be used.  A central goal of the preclearance requirement of Section 5 was to block new changes so as "shift the advantage of time and inertia" from state and local officials who wish to impose a new voting practice to minority citizens seeking equal voting rights.  *South Carolina v. Katzenbach*, 383 U.S. 301, 328 (1996).   Here, however, Defendants' dilatory adoption and submission of their plan and the proposed use of its unprecleared plan would shift the burden of time and inertia back onto minority citizens of Evergreen while they remain in office beyond their statutory terms  in what amounts to defiance of the law.

The Attorney General has advised Defendants that the information provided by them was "insufficient to enable us to determine that the proposed change has neither the purpose nor would have the effect of denying or abridging  the right to vote based on race, color or membership in a language minority group", and has identified the specific information necessary for him to reach a positive conclusion under Section 5 – assuming that the information is positive for Defendants – that the plan was not adopted with a racially discriminatory purpose.[5]

---

[5] As the Court in *Texas v. United States*, __ F. Supp.2d ____, 2012 WL 3671924 at 12 (D.D.C. August 28, 2012) noted, the Supreme Court in *Reno v. Bossier Parish School Board* (*Bossier II* ), 528 U.S. 320, the Supreme Court held that the purpose prong of Section 5 "extended only to intent to retrogress, not to all intentional discrimination. … In direct response, the 2006 amendments to section 5 clarified that the term "purpose" must be read more broadly and includes "any discriminatory purpose." 42 U.S.C. § 1973c(c); *see also* H.R.REP. NO. 109–478, at 93, 2006 U.S.C.C.A.N. 618, 678 (stating that Congress "rejects the Supreme Court's holding

Defendants have failed to provide or, to the best of Plaintiffs' knowledge, even begin to gather the information requested or to meet their burden of proving the absence of a racially discriminatory purpose in the adoption of their plan.

.    In *Perry v. Perez*, 132 S.Ct. 934 (2012) the Supreme Court recently provided guidance to courts faced with the necessity to draw districts where, as here, the locally adopted plan has not been precleared and where the Attorney General has not announced the basis for an objection. The Court reiterated its rule that any decision on the merits as to whether a plan is free of any proscribed racial purpose or effect is within the sole jurisdiction of the United States District Court for the District of Columbia. *Perry v. Perez*, 132 S. Ct. at 942. The Court held that a district court should "take care not to incorporate into the interim plan any legal defects in the state plan", 132 S.Ct. at 941, and that the district court should not incorporate any "aspects of the state plan that stand a reasonable probability of failing to gain § 5 preclearance. And by 'reasonable probability' this Court means in this context that the § 5 challenge is not insubstantial." 132 S. Ct. at 942.[6]

---

in *Reno v. Bossier Parish* "). As a result, we may not preclear any redistricting plan enacted with discriminatory intent."

[6] The Court also directed district courts should take guidance from the State's recently enacted plan and avoid changing any unproblematic features in drafting an interim plan. Id. Taking guidance from a statewide redistricting plan is one thing. Taking guidance from a small municipal plan is quite another. The Texas House of Representatives, for example, is elected from 150 districts. http://www.house.state.tx.us/ . In *Perry v. Perez* as in *Upham* v. *Seamon*, 456 U. S. 37, 42– 43 (1982) *(per curiam)*, large areas of Texas were not in dispute, and those areas offered guidance to the district court: the court could adopt numerous undisputed legislative districts without change. Similarly, objectionable districts to an Alabama state legislative plan in the Tennessee Valley would not justify alterations in districts on the Gulf Coast.

   This Court's ability to take guidance from the policies of the Evergreen elected officials, however, is completely thwarted here. First, the Defendants have refused to advise the Attorney General what its policies are. Second, there is no unchallenged area of the plan that can be left untouched: here, the minority population concentration is both "packed" and fractured, and such features are clearly associated with the Attorney General's concern with the possibility that a

### B. Plaintiffs' Objections to Defendants' Redistricting Plan are Substantial under Section 5 Standards

Here, Plaintiffs' claim that the plan fails to satisfy Section 5 standards clearly is not insubstantial. The Attorney General's request for additional information standing alone gives it substance as, indeed, does Defendants' continuing failure to make their case to the Attorney General that their plan merits preclearance. The experience of the administrative enforcement of Section 5 (the course that Defendants opted to pursue), moreover, offers clear guidance as to the burden of proof on Defendants.

For example, on June 5, 1992 Assistant Attorney General John R. Dunne interposed a Section 5 objection to a redistricting plan for the Town of Johnston, South Carolina under circumstances on all fours with those of Evergreen. ***Plaintiffs' Exhibit 13***. As set forth in the June 5, 1992 letter, the black population of Johnston had increased from 53.6 percent to 60.5 percent over the course of the preceding decade. *Id*. The Town's proposed plan packed black population into three of the six districts, each with a black majority of 82 percent or more, while a fourth district (Ward 6) had a 56 percent black population majority. *Id.* In light of the packing and fragmentation of minority population, the Town failed to meet its burden of demonstrating that the plan was not discriminatory. Id. The Town redrew district lines so as to raise the black percentage in Ward 6 to 61 percent, but on July 6, 1993, Acting Assistant Attorney General James P. Turner interposed an objection to that plan as well because an alternative plan would have created "a Ward 6 in which the black electorate would have a more realistic opportunity to

---

racially discriminatory purpose infects the plan. Third, the very size, shape and population of census blocks with which any plan must be built limit redistricting options given the small population of each council district and force a significant ripple effect.

13

elect a candidate of its choice." ***Plaintiffs Exhibit 14***, p. 2.  So much is equally true of Evergreen.

The example of the Town of Johnston is hardly isolated. Between 1980 and 1990 the black share of the population of Greensboro, Alabama, had reached 62 percent and its voting age population was 56 percent black. ***Plaintiffs Exhibit 15***.  The City proposed a plan in which two of the five council districts were over 75 percent black in voting age population and where a third district, district 2, had a black voting age population of 58 percent that had proved ineffective in a special election. Id.  Again, in addition to packing black population in two districts, the City had fragmented the remaining minority population.  Id.  Assistant Attorney General Dunne interposed an objection to the plan on December 4, 1992, where the city had failed to prove that district 2 had not been drawn "to limit black voting strength." Id.  Greensboro subsequently made minor adjustments to district 2 to raise its black percentage slightly, but did not cure the fragmentation and on January 3, 1993, Acting Assistant Attorney General James P. Turner interposed an objection to that plan as well.  ***Plaintiffs' Exhibit 16***.   So much is equally true of Evergreen.

Similarly, when the black percentage of Selma, Alabama had increased from 52.1 to 58.4 percent and the City packed black population into four of nine city council districts with black majorities of 78 to 95 percent and fragmented the remaining minority population so as to avoid drawing a fifth district with an effective black majority, Assistant Attorney General Dunne interposed an objection on November 12, 1992.  ***Plaintiffs Exhibit*** 19 .   And when Dallas County, Alabama developed its first single-member district plan, Assistant Attorney General William Bradford Reynolds interposed an objection to the proposed change.  ***Plaintiffs Exhibit 20.***  The objection letter noted that although the districting plan was not retrogressive within the

meaning of Section 5, the county had not met its burden of proving the absence of a racially discriminatory purpose in light of the fragmentation of the black population; the lack of meaningful black input into the development of the plan; the fragmentation of black population was alleged to have been accomplished to assist the re-election of a white incumbent; and the lack of any nonracial explanation of the fragmentation.  Id. at 1-2.  So much is equally true of Evergreen.

The United States District Court of the District of Columbia, the alternative preclearance avenue for Defendants, is the same.  A superficial but ineffective black majority does not satisfy Section 5.  *Hale County v. United States*, 396 F.Supp. 1206 (D.D.C. 1980).  In *Busbee v. Smith*, 549 F. Supp. 494 (D.D.C. 1982, aff'd 459 U.S. 1166 (1986), for example, the court found a redistricting plan intentionally discriminatory where the state of Georgia increased the black percentage in a district from 50.3 percent to 57.3 percent, that

> The actions of the legislators who adopted Act No. 5 also speak for themselves. The legislators knew a cohesive black community existed in south Fulton and DeKalb Counties, that it would take a 65 percent black population to allow a black electoral majority and that the Fifth District embodied in the final conference report divided the black community and prevented a black majority. The Fifth District was drawn to suppress black voting strength in Georgia.

549 F. Supp. at 498.  The District of Columbia Court most recently discussed the continuing viability of the 65 percent minority threshold for an effective minority district.  *State of Texas v, United States*, 831 F.Supp. 2d 244, 263 n. 22 (D.D.C. 2011) (discussing numerous cases), and has held that "[w]e agree with the United States that this "representation gap" between the number of districts proportional representation would yield and the number of districts the legislature has actually created is a strong indicator of the 'degree of discrimination'." *State of Texas v, United States,* 2012 WL 3671924  at 17.  The District of Columbia Court also

15

highlighted the importance of fragmenting minority concentrations and "packing" districts with minority population well in excess of levels needed to assure minority success. Id. at 73.

It bears noting that, as set forth in the Attorney General's Guidance Concerning Redistricting under Section 5 of the Voting Rights Act: Notice, 76 Fed. Reg. 7470, 7471 (February 9, 2011),[7] a determination that a plan was enacted with a racially discriminatory purpose does not necessitate a finding of racial animus:

> The Department will also evaluate whether there are instances where the invidious element may be missing, but the underlying motivation is nonetheless intentionally discriminatory. In the *Garza* case, Judge Kozinski provided the clearest example:
>> Assume you are an anglo homeowner who lives in an all-white neighborhood. Suppose, also, that you harbor no ill feelings toward minorities. Suppose further, however, that some of your neighbors persuade you that having an integrated neighborhood would lower property values and that you stand to lose a lot of money on your home. On the basis of that belief, you join a pact not to sell your house to minorities. Have you engaged in intentional racial and ethnic discrimination? Of course you have. Your personal feelings toward minorities don't matter; what matters is that you intentionally took actions calculated to keep them out of your neighborhood.
>
> *Garza and United States* v. *County of Los Angeles,* 918 F.2d 763, 778 n.1 (9th Cir. 1990) (Kozinski, J., concurring and dissenting in part), *cert. denied,* 498 U.S. 1028 (1991).

In *Garza*, the County had contended that the redistricting plan was not racially discriminatory in its purpose, but instead was "intended to perpetuate their own incumbencies." The court of appeals rejected this contention (as had the district court), saying "[a]lthough the [district] court noted that 'the Supervisors appear to have acted primarily on the political instinct of self-preservation,' the [district] court also found that they chose fragmentation of the Hispanic voting population as the avenue by which to achieve this self-preservation." 918 F. 2d at 768. The court of appeals continued: "The supervisors intended to create the very discriminatory result that occurred. That intent was coupled with the intent to preserve incumbencies, but the

---

[7] http://www.justice.gov/crt/about/vot/sec_5/sec5guidance2011.pdf

16

discrimination need not be the sole goal in order to be unlawful. See *Arlington Heights v. Metropolitan Housing Dev. Corp.*, 429 U.S. 252 (1977)." 918 F. 2d at 771.

The claims of Plaintiffs therefore are far from insubstantial. The circumstances of Johnson, Greensboro and Selma are strikingly similar to those of Evergreen. There as here, a white mayor and white majority city council were faced with a population that now had a substantial black population and voting age majority. Under the proposed plan, white voters, who comprise less than 40 percent of the population, can elect members of their choice in 60 percent of the council districts district while the 62 percent black majority of voters can elect members of their choice to only 40 percent of the seats. Past election returns in the city and county showed that "blacks and whites generally preferred different candidates," *Thornburg v. Gingles*, 478 U.S.30, 53 (1986). Given such racial polarization, a redistricting plan with "a number of districts in which the minority community forms an effective majority … roughly proportional to its share of the population," *LULAC v. Perry*, 548 U.S. 399, 426 (2006), would be likely to create severe problems for one of the white incumbent council members. Amid the historical background of ongoing racial discrimination in voting; the closed process and exclusion of the minority community in the period leading up to the decision; the adoption of a new and unauthorized system for voter eligibility with a disparate impact on black citizens, the substantively departure from the normal practice of maintaining population deviations within plus or minus five percent; the enforcement of the plan and the voter eligibility change in violation of Section 5; Defendants' withholding of their contemporaneous statements and other legislative history from the Attorney Generals' scrutiny; and the disparate impact of the plan, *Village of Arlington Heights* v. *Metropolitan Housing Development Corp.,* 429 U.S. 252, 266-68 (1977), there certainly is a "not insubstantial" likelihood that Defendants cannot meet their

burden of proof as to a racial purpose under Section 5.[8]  Given their refusal actively to seek preclearance, they certainly will not obtain it.  It falls to the Court to order a new, legally enforceable districting plan consistent with "the body of administrative and judicial precedents developed in Section 5 cases."

### C.  **Plaintiffs' Proposed Redistricting Plan Fully Satisfies All Legal Standards**

Such a plan is at hand.  The Supreme Court has held that "in fashioning the plan, the court should follow the appropriate Section 5 standards, including the body of administrative and judicial precedents developed in Section 5 cases." *McDaniel v. Sanchez*, 421 U.S. 130,149 (1981). Further, "'unless there are persuasive justifications, a court-ordered reapportionment plan … must ordinarily achieve the goal of population equality with little more than *de minimis* variation.' *Chapman v. Meier*, 420 U.S. at 26-27." *Connor v. Finch*,431 U.S. at 414.   That guidance, set forth above, points directly to Plaintiffs' plan.

The redistricting plan proposed by the Plaintiffs and attached to the accompanying Proposed Order falls squarely within "the body of administrative and judicial precedents developed in Section 5 cases" described above and would fully satisfy the requirements of federal law.  The plan provides for five districts drawn so that no district deviates from the ideal population by more than two persons, for a deviations range of only 0.38 percent (+0.13 percent and -0.25%).  Three of the five districts have black population majorities that meet the Section 5 effectiveness standard:  65.6 percent in district 1, 86.5 percent in district 4 and 87.1 percent in

---

[8] The presence of the factors set forth in *Thornburg v. Gingles*, 478 U.S.30, 53 (1986), (including the "Senate Factors") also establish a likelihood that Plaintiffs would succeed on the merits of their claim under Section 2 of the Voting Rights Act, 42 U.S.C. 1973. And the very overpopulation of  districts in the core minority area of Evergreen raises a substantial issue under *Larios v. Cox*, 300 F. Supp.2d 1320 (N.D. Ga. 2004) *aff'd* 542 U.S. 947 (2004).  Given the clarity that the claims under Section 5, however, the Court need not reach these claims.

district 5, while districts two and three have white majorities of 64.9 percent and 57.6 percent.[9]

The plan thus fully satisfies the one-person, one-vote command of the 14th Amendment and the *de minimis* deviation requirements of *Connor v. Finch, supra*, as well as the requirements of both Section 2 and Section 5 of the Voting Rights Act: the plan provides "a number of districts in which the minority community forms an effective majority … roughly proportional to its share of the population," 548 U.S. at 426.

To the extent that a racially neutral governmental interest can be discerned in the Evergreen redistricting with any confidence, each district is compact and contiguous. And the plan places the residence of each incumbent council member in a separate district that retains in each case the core of the district from which that member has been elected under both the 2001 and proposed 2012 plans.

Plaintiffs' plan thus comfortably satisfies all legal standards for a court-ordered plan. Defendants' proposal to use an unprecleared plan invites the Court to violate clear and emphatic Supreme Court precedent. The alternatives offer the Court a straightforward choice.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court issue the accompanying Order implementing the proposed redistricting.

Dated:  December 11, 2012

                Respectfully submitted,

                /s/John K. Tanner
                JOHN K. TANNER

---

[9] The voting age population percentages reported by the Alabama Reapportionment Office give the percentage of people of voting age out of the *total* population rather of the voting age population. The percent black of voting age population in each district is (1) 60.0; (2) 28.2; (3) 37.0; (4) 83.0; and (5) 83.7.

3743 Military Road, NW
Washington, DC 20015
john.k.tanner@gmail.com
Admitted pro hac vice
Tel: 202-503-7696

/s/Amardo Wesley Pitters
AMARDO WESLEY PITTERS
[8998-T64A]
P.O. Box 1973
Montgomery, AL 36102
Tel: (334)265-3333
Fax: (334)365-3411
awpitters@pitterslawfirm.com

## CERTIFICATE OF SERVICE

I hereby certify that on this 11th day of December, 2012, I served a copy of the foregoing was duly served on the below counsel for the defendants by electronic filing and transmitted to the Clerk of Court for filing in the Federal Court ECF system:

James Anderson, Esq.
Jessie Kirk Anderson, Esq.
Jackson, Anderson & Patty
250 Commerce Street, Suite 100
P.O. Box 1988
Montgomery, Alabama 36104

/s/ Amardo Wesley Pitters
Amardo Wesley Pitters