IN THE UNITED STATES DISTRICT COURT
FOR THESOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

DAN ALLEN, et al.,                          )
                                            )
     Plaintiffs,                            )
                                            )
vs.                                         )          Case Nos.:  1:13-cv-00107—CG-M
                                            )
CITY OF EVERGREEN, ALABAMA;                 )
et al.,                                     )
                                            )
     Defendants.                            )

**MOTION FOR SUMMARY JUDGMENT AND MOTION FOR RELIEF UNDER
SECTION 3 OF THE VOTING RIGHTS ACT**

     The Plaintiffs Gerald Allen et al. respectfully move this Court for summary judgment

pursuant to Rule 56(a), Fed. R. Civ. P. as to Claims III and IV (violation of the Fourteenth

Amendment) of the Complaint in this action.  Doc. 1, p. 13.  Plaintiffs further move pursuant to

Plaintiffs' prayer that the Court grant "such other and further relief as it deems is proper and

just," doc. 1, p. 16, that the Court designate the City of Evergreen pursuant to Section 3(a), 42

U.S.C. 1973a(a) of the Voting Rights Act to allow the United States Attorney General to assign

federal observers to monitor Evergreen municipal elections[1] and Section 3(c) of the Act, 42

---

[1] Section 3(a) provides that:
Whenever the Attorney General or an aggrieved person institutes a proceeding under any statute
to enforce the voting guarantees of the fourteenth or fifteenth amendment in any State or political
subdivision the court shall authorize the appointment of Federal observers by the Director of the
Office of Personnel Management in accordance with section 1973dÂ of this title to serve for
such period of time and for such subdivisions as the court shall determine is appropriate
to enforce the voting guarantees of the fourteenth or fifteenth amendment (1) as part of any
interlocutory order if the court determines that the appointment of such observers is necessary to
enforce such voting guarantees or (2) as part of any final judgment if the court finds that
violations of the fourteenth or fifteenth amendment justifying equitable relief have occurred in
such State or subdivision: *Provided*, That the court need not authorize the appointment of
observers if any incidents of denial or abridgement of the right to vote on account of race or

U.S.C. 1973a(c)[2] to provide that this Court review two and only two distinct types of voting changes by the City and for a limited period: a change in the redistricting plan for city council elections and a change in the standards for determining which voters are eligible to participate in Evergreen municipal elections for a period of seven years, until December 31, 2010, i.e., though the 2006 and 2010 municipal elections.

As set forth in the accompanying Memorandum of Points and Authorities on Behalf of Motion for Summary Judgment and Motion for Relief under Section 3 of the Voting Rights Act, the undisputed facts show that the defendants have violated the constitutional rights of the plaintiffs, and that relief under Section 3 of the Voting Rights Act is fully warranted and appropriate.

---

color, or in contravention of the voting guarantees set forth in section 1973b(f)(2) of this title (1) have been few in number and have been promptly and effectively corrected by State or local action, (2) the continuing effect of such incidents has been eliminated, and (3) there is no reasonable probability of their recurrence in the future.

[2]  Section 3(c) provides that: If in any proceeding instituted by the Attorney General or an aggrieved person under any statute to enforce the voting guarantees of the fourteenth or fifteenth amendment in any State or political subdivision the court finds that violations of the fourteenth or fifteenth amendment justifying equitable relief have occurred within the territory of such State or political subdivision, the court, in addition to such relief as it may grant, shall retain jurisdiction for such period as it may deem appropriate and during such period no voting qualification or prerequisite to voting or standard, practice, or procedure with respect to voting different from that in force or effect at the time the proceeding was commenced shall be enforced unless and until the court finds that such qualification, prerequisite, standard, practice, or procedure does not have the purpose and will not have the effect of denying or abridging the right to vote on account of race or color, or in contravention of the voting guarantees set forth in section 1973b(f)(2) of this title: *Provided*, That such qualification, prerequisite, standard, practice, or procedure may be enforced if the qualification, prerequisite, standard, practice, or procedure has been submitted by the chief legal officer or other appropriate official of such State or subdivision to the Attorney General and the Attorney General has not interposed an objection within sixty days after such submission, except that neither the court's finding nor the Attorney General's failure to object shall bar a subsequent action to enjoin enforcement of such qualification, prerequisite, standard, practice, or procedure.

WHEREFORE, plaintiffs pray that the Court will grant their motions for summary judgment and for relief pursuant to Sections 3(a) and 3(c) of the Voting Rights Act.

Dated:  August 1, 2013

Respectfully submitted,

/s/John K. Tanner
JOHN K. TANNER
3743 Military Road, NW
Washington, DC 20015
john.k.tanner@gmail.com
Admitted pro hac vice
Tel: 202-503-7696


/s/Armardo W. Pitters
ARMARDO W. PITTERS [8998-T64A]
P.O. Box 973
Montgomery, AL 36102
Tel: (334)265-3333
Fax: (334)365-3411
awpitters@pitterslawfirm.com

IN THE UNITED STATES DISTRICT COURT
FOR THESOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| DAN ALLEN, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | Case Nos.:  1:13-cv-00107—CG-M |
| | ) | |
| CITY OF EVERGREEN, ALABAMA; | ) | |
| et al., | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OF POINTS AND AUTHORITIES ON BEHALF OF MOTION FOR SUMMARY JUDGMENT AND MOTION FOR RELIEF UNDER SECTION 3 OF THE VOTING RIGHTS ACT**

## I.      INTRODUCTION

Plaintiffs respectfully move this Court pursuant to Rule 56(a), Fed. R. Civ. P., for summary judgment as to Claims 3 and 4 (violation of the Fourteenth Amendment) of the Complaint in this action.  Doc. 1, p. 13.  Plaintiffs further move pursuant to plaintiffs' prayer that the Court grant "such other and further relief as it deems is proper and just," doc. 1, p. 16, that the Court designate the City of Evergreen pursuant to Section 3(a), 42 U.S.C. 1973a(a) of the Voting Rights Act to allow the Attorney General to assign federal observers to monitor Evergreen municipal elections. and Section 3(c) of the Act, 42 U.S.C. 1973a(c), to provide that this Court review two and only two distinct types of voting changes by the City and for a limited period: a change in the redistricting plan for city council elections and a change in the standards for determining which voters are eligible to participate in Evergreen municipal elections for a period of seven years, until December 31, 2010, *i.e.*, though the 2010 municipal elections.

As discussed within, Section 3 of the Voting Rights Act provides a mechanism for federal monitoring of elections and for review of voting changes in jurisdictions similar to the mechanisms triggered by coverage under Section 4 of the Voting Rights Act which, of course, was struck down in *Shelby County v. Holder*, 133 S.Ct.. 2612 (2013). All U.S. jurisdictions are eligible for Section 3 coverage. Section 3(a) coverage allows the Attorney General to assign federal observers to monitor elections for a set period. Section 3(c) relief differs from the familiar Section 5 requirements in that this Court, rather than the District Court for the District of Columbia would assess any new procedure.[1] And, as requested by the plaintiffs, Section3(c) coverage would only extend to the types of changes that prompted this lawsuit rather than all voting changes, and the review requirement would cease prior to the 2020 census. Absent a new redistricting or voter qualification change by City there would be nothing for the City to submit and nothing for this Court to review. The relief thus would provide court oversight to protect for a finite period the discrete gains already won by black voters in this litigation.

Both Sections 3(a) and 3(c) require a finding of a constitutional violation,[2] and the facts set forth below establish such a violation. These facts were placed on the record as early as December 12, 2013. Defendants have never contested them. *See, e.g.,* Doc. 30 and Doc. 46.

---

[1]  The City would be able to seek review and "preclearance" from the Attorney General if it so chose.  42 U.S.C. 1973a.

[2]  Section 3(a) authorizes relief "as part of any final judgment if the court finds that violations of the fourteenth or fifteenth amendment justifying equitable relief have occurred in such State or subdivision."  42 U.S.C. 1973a(a).  Section 3(c) authorizes relief where the court finds such violations "have occurred within the territory of such State or political subdivision."  42 U.S.C. 1973a(c).

## II. UNDISPUTED FACTS

**A.  Background**

1.  Plaintiffs filed this action on August 6, 2012 seeking declaratory and injunctive relief based on the following claims:  Claims 1and II alleged violations of Section 5 of the Voting Rights Act, 42 U.S.C. 1973c respecting the City's redistricting plan and its change in the method of determining which registered voters would be eligible to participate in the 2012 Evergreen municipal election; Claims III and IV allege that the redistricting plan and voter eligibility scheme violate the 14th Amendment; and Claim V asserted that the redistricting plan violated Section 2 of the Voting Rights Act.  Doc. 1, 12-13.

2. Plaintiffs requested that the Court enjoin permanently the defendants from conducting any election using the 2012 Plan, or any other districting plan that violates the United States Constitution and/or federal law; and that the Court grant such other and further relief as it deems is proper and just.  Doc. 1, 13-14

3.    Plaintiffs alleged in pertinent part that:

15. Evergreen and Conecuh County have a history of racial discrimination in voting, including harassment and direction of racial slurs to black voters. ….

16. … Elections in Evergreen are characterized by racially polarized voting.

17. …Evergreen has 3,944 residents, of whom 2,467 (62.55%) are black (i.e., non-Hispanic African Americans), up from only 52.8 percent black in 2000.

18. The 2010 census also revealed that the districts in Defendants' 2001 Plan now vary from the ideal population of 789 persons by nearly 50 percent….

20. The …black population of Evergreen is sufficiently large and geographically compact for black voters to comprise a sufficiently large majority of voting age citizens in at least

three council districts for Black voters in those districts to enjoy an equal opportunity to elect representatives of their choice to the city council.

22. The United States Constitution requires that municipal city council districts have equal populations, so that no districts exceeds or falls below the ideal population by more than five percent. …

23. Black citizens of Evergreen formally addressed a December 2011 council meeting and requested that Defendants adopt a specific redistricting plan. … The city attorney stated that the proposal was "a bit premature." …

25. , Defendants failed to conduct public hearings on the 2012 Plan and failed to publish the Plan in the local newspaper for two consecutive weeks.

26. Defendants conducted a "working session" on the plan on April 19, 2012. During the course of the meeting one council member determined from the attendance of two non-resident white persons that the meeting was not properly an executive session and alerted local black citizens, who arrived and discussed alternative plans, including a compromise plan….

27. Defendants failed to make a record of the April 9, 2012 meeting or the alternative plans … and such failure violated the Alabama Open Meetings Act.

28. The demographer retained by the city to draw the plan acknowledged before the city council that the compromise plan was fairer than the plan that the adopted 2012 Plan. Notwithstanding this counsel, Defendants suspended the rules and declared the 2012 Plan adopted unanimously (although two council members voted "nay") on May 15, 2012.

29. The 2012 Plan packs black population into two districts, districts 4 and 5, both of which are over 86.5 percent black in population. The remaining black population is

4

fragmented among districts 1, 2 and 3, none of which is less than 35.6 percent black in population. District 5 is over-populated in excess of five percent.

30. …. The 2012 Plan is a change affecting voting subject to the preclearance requirements of Section 5. …

34. As a result of the Defendants' delay in adopting the 2012 Plan; in seeking Section 5 preclearance….; in failing to seek expedited consideration; and in failing to provide the information reasonably necessary for the Attorney General's review, Defendants effectively have guaranteed that they would not obtain Section 5 preclearance in time for the 2012 Plan to be implemented in accordance with state and federal law. …

36. Despite the absence of Section 5 preclearance…Defendants have begun to conduct the 2012 election for mayor and council members using the 2012 plan. …

37. Unless enjoined by this Court, Defendants will continue to violate Section 5 of the Voting Rights Act by continuing to administer and implement the unprecleared district boundaries on and beyond the August 28, 2012 Election Day….

38. In preparing the voter list for the city and each of the city council districts, Defendants departed from past practice. Consistent with Alabama law, in preparing lists of voters eligible to cast ballots in municipal elections the practice in Evergreen, as in Alabama generally, has been for the clerk to identify those persons who are on the county voter registration list whose addresses are within the city limits.

39. Defendants have instituted as separate procedure for the August 28, 2012 election. Defendants have prepared a voter list based on the intersection between the list of city utility customers and the list of registered voters. Persons who are registered to vote in

Conecuh County are deemed eligible to vote in city elections if and only if their names appear on the list of city utility customers.

40. Some registered voters whose names do not appear on the list of utility customers have been placed on a separate list of "Problem Voters." Voters on that list are to be required to prove their residence within the city before the election or at the polls on Election Day. Other registered voters known to reside within Evergreen have been left off the voter list entirely. It also is possible under Defendants' new system that individuals who own rental or other property within the city limits but who themselves live outside the city limits will be allowed to vote under this system even though they are not eligible.

41. The Problem Voters list affects an extraordinary number of voters. The Problem Voters list for district 4 contains the names of 220 voters. District 4 has a 2010 voting age population of only 517 persons, so that over 42 percent of the entire voting age population of the district is on the problem list. Over 83 percent of the voting age population if district 4 is black.

42. As a result of the new system, voters whose names appear on the Problem Voters list will face new burdens to prove their eligibility and/or have to fill out additional forms, face challenges to their eligibility from poll watchers, and endure explanation, discussion and argument at the polls.

43. Defendants have implemented this system by distributing the Problem Voters lists developed under the new system to candidates for city office as the official list of voters for the 2012 city election, and thus to other individuals.

44. The Problem Voters list procedure adopted and enforced by Defendants constituted a

change affecting voting subject to the preclearance requirements of Section….

Defendants have not obtained preclearance. …

4.  Defendants have not filed an Answer to the complaint, and during the course of this

litigation, defendants have not denied any allegation in the complaint or placed in evidence any

fact to refute any allegation in the Complaint.  Each allegation of the Complaint is in fact true.

**B.  Adoption of Racially Discriminatory System for Determining Eligibility to Vote in
Evergreen Elections**

5. From 2000 to 2010, the population of Evergreen increased from 3,612 to 3,944.  Doc.

23-1, EX. 1.  During that period, the white population of Evergreen declined by 305 persons and

the black population of Evergreen increased by 546 persons, so that the city became majority

black in both total population (62.4%) and only 34.8 percent white, the remainder being of other

races or two or more races.  Id.

6.  "As in other Alabama cities, in Evergreen the past procedure has been to include all

Conecuh County registered voters whose registration reflects an addresses within the city limits:

such persons comprise the list of eligible voters for municipal elections." Dkt. 13, p 2.

7.  Faced with a black majority in voting age population, defendants adopted a new

procedure for determining which registered voters reside within the City of Evergreen. Id.

8.  Defendants prepared two separate and unequal lists of registered voters and did so

starting not with the county voter registration list but with the city utility list and/or the E-911 list

and placed those and only those voters in whose names municipal utilities were billed on the

municipal registered voter list for the 2012 elections. Dkt. 8 pp. 3-4; Doc. 23-1, 45-49.  Hundreds

of other persons who were registered voters in the county and had city addresses but who were

not named municipal utility customers or named on the E-911 list were placed on a separate list that the City labeled "Problem Voters." Id.

9.   Defendants also purged voters based solely on rumor and supposition so that registered voters with city addresses were removed entirely from both voter lists. Doc. 23-1, 48-49.  Defendant's also included the names of dead persons on the "good" list of eligible voters. Id.

10.  The list of Problem Voters disproportionately included black voters. Doc. 23-1, 45-49.  In addition, the confusion and uncertainty generated by the City's action placed special burdens on black political activities.  Id.

11.  Defendants implemented the new system in violation of federal law, persisted in the system after being informed of the gross inaccuracies of the system, and retained the system until enjoined by this Court.  Doc. 8; Doc. 23-1, 45-49.

12.  Based on the evidence of the conduct of the City, this Court ordered a Special Master to oversee the development of a voter list for a special municipal election to replace the enjoined August 28, 2012 election and to supervise the conduct of that special election. Doc. 8; Doc. 13.

**C.  Adoption of Racially Discriminatory Redistricting Plan**

13.  The black population of Evergreen is heavily concentrated in the southern and western portions of the city. Doc, 23-1, 28-30.  The concentration of black population within Evergreen is such that it is possible to draw three compact and contiguous city council districts with black majorities in excess of 65 percent. Doc. 23-1, 2-10; Doc.36-1, Doc. 45, 2-3.

14.  Population shifts from 2000 to 2010 left the 2001 city council districts mal-apportioned in terms of population to the disadvantage of the black community, as the area covered by two overwhelmingly black districts had a net overpopulation. Doc. 23-1, 19-21.

15.  Although the 2010 census showed a 62.4 percent black majority in Evergreen, as a realistic matter the 2001 plan provided for three districts with effective white majorities: Districts 2 and 3 have substantial white majorities, and district 4 and 5 are overwhelmingly black in population, while a third district (District 1) was 51.0 percent black in voting age population. Id. White persons, however, comprise a majority of the registered voters who reside in District 1, and white candidates consistently have carried the district. Doc. 23-1, 31-47.

16.  The 2012 redistricting plan adopted by Defendants continued the packing of black population into two of the city's five council districts (4 and 5), both of which exceeded 85 percent in black population. District 1 remained unchanged at 51.0 percent black in voting age population, Doc. 23-1, 19-23, and with a white voter registration majority of 227 to 201.  Doc. 23-1, 45-47. The proposed plan fragmented the concentrated black population concentration. Compare Doc. 23-1, 18 and Doc. 23-1, 28-30.

17.  Voting in Evergreen is racially polarized. City election returns for 2004 and 2008 show that the predominantly white districts/precincts gave large majorities to the white candidates for mayor against the black candidates, while the predominantly black precincts delivered large majorities for the black candidate of choice.  Doc. 23-1, 31-44,53-56.  The election returns also demonstrate that District 1, although 51 percent black in voting age population, is controlled by white voters: amid racially polarized voting, the black mayoral candidate lost in district 1 in 2004 and in the 2008 primary and run-off; and the black candidate for city council lost to his white opponent in 2004. Id. Thus, within district 1 the choice of white voters has prevailed in every municipal election.  Id.

18.  Voting also continues to be racially polarized in state and federal elections. Doc. 23-1, 53-56.  Among Conecuh County precincts that include major parts of Evergreen, just as in

municipal elections, the predominantly white precinct delivers large majorities against black candidates in contests between black and white candidates, while the predominantly black precincts deliver large majorities for the black candidates.  Id.

**D.  Racial Discrimination in Voting in Evergreen**

19.   Black citizens of Evergreen continue to bear the effects of discrimination in such areas as housing, education, employment and income, which hinder their ability to participate effectively in the political process.  Doc. 23-1, 74-79.   The mean per capita annual income of black residents ($8,496) is less than 40 percent of that of white residents ($21,275), and black residents are at a similar disadvantage in home ownership and value of home, proportion of income devoted to mortgage or rent payments, and educational attainment. Id. .

20.   Alabama has a long history of racial discrimination in voting.

21.   Evergreen and Conecuh County share in that history. Doc. 23-1, 50-51; paragraphs – *infra*.  After the 1965 passage of the Voting Rights Act and the enfranchisement of black voters, the first black candidates for office emerged in 1970. Doc. 23-1, 57-58. The county promptly changed the method of electing both the Board of Directors (the county governing body, now "county commissioners"), and the County Democratic Executive Committee, the body which selected polling place officials for county elections to a multi-member district system that submerged the votes of majority-black areas. Id.

22.   The county enforced these voting changes in violation of federal law until the United States  Department of Justice notified local officials of their obligations under the Voting Rights Act, and on September 14, 1981, the Attorney General interposed a Section 5 objection to the change for the county commission, noting that at the time of the change, that:

…minorities who were becoming active politically as a result of increased registration following the enactment of the Voting Rights Act of 1965 constituted a majority in one of the single-member districts. … The change has submerged into larger multi-member districts sizeable black concentrations so as to dilute the minority voting strength that those voters would have enjoyed under a continued single-member district plan. These circumstances, in the context of the racially polarized voting patterns that seem to exist in Conecuh County, raise at least an inference of a proscribed racially discriminatory purpose.

Id.

23.   A similar Section 5 objection was interposed to the change in method of election for the Conecuh County Democratic Executive Committee on April 23, 1982.  EX. 2. There, the county had changed from election by individual voting precincts, many of which had emerging black majorities, to election in two large multi-member districts each of which had a substantial white voting majority. *Id*. Local citizens filed suit to enforce the objections and obtain fairly apportioned election systems. Id. The county subsequently adopted a single-member district plan and submitted that plan for Section 5 review on July 21, 1982. Doc. 23-1, 59-61.  On July 26, 1982, the Attorney General interposed an objection to the county's proposed redistricting plan, noting the "high level of racial bloc voting in the county," and that the county's proposed plan failed to contain a single black majority district despite the heavy concentration in and adjacent to the City of Evergreen, which the county's plan had needlessly fragmented; the letter also specifically admonished the county against "packing" minorities into a district. *Id.*

24.  Discrimination against black voters at the polls in Conecuh County prompted suit based on racially discriminatory conduct by white poll workers.  *United States v. Conecuh County*, No. 83-1201-H (S.D. Ala. June 12, 1984).  *See* paragraphs 25-29.

25.  Attorneys General have assigned federal observers to monitor elections in Evergreen and Conecuh County 13 times between 1980 and 2013, or more than any other county in Alabama during that period except for Dallas County (Selma), which also had 13 elections monitored by federal observers. *See* http://www.lawyerscommittee.org/projects/section_5/.

26.  In the 2008 municipal election involving a contest between black and white candidates for mayor, white men in pick-up trucks stationed themselves outside each polling place and filmed black voters as they went to the polls in what was taken as an effort to deter and intimidate the black voters. Doc. 23-1, 50.

27.  Assignment of federal observers requires the Attorney General to certify that in his judgment constitutional violations have occurred and/or are likely to occur.  42 U.S.C. 1973f(2)(a).

28.  Federal observers were present in the City of Evergreen to monitor the June 17, 2013 Evergreen election.  http://www.justice.gov/opa/pr/2013/June/13-crt-684.html. Accordingly, Conecuh County and Evergreen have been designated for federal observers more often than any other part of Alabama.

29.  The reports of federal observers are not public, but court papers in litigation in Conecuh County provide details from observer reports that document in detail the mistreatment of black citizens at the polls.  As set forth in Barry H. Weinberg and Lyn Utrech, *Problems In America's Polling Places: How They Can Be Stopped*, 11 Temp. Pol. & Civ. Rts. L. Rev. 401,

12

408-411, 420-421, 440-441 (2002):[3]

Federal observers were able to note and document a wide variety of discriminatory actions that were taken against African-Americans in the polls. Some of these insulting and direct actions are reflected in the United States' responses to interrogatories in U.S. v. Conecuh County.

While providing assistance to a black voter, white poll official [] asked, "Do you want to vote for white or n[****]rs?" The voter stated that he wanted to give everyone a fair chance. [] proceeded to point out the black candidates and, with respect to one white candidate, stated, "This is who the blacks are voting for." Poll official [] made further reference to black citizens as "n[****]rs" in the presence of federal observers, including a statement that "n[****]rs don't have principle enough to vote and they shouldn't be allowed. The government lets them do anything." …

African-American voters who were unable to read and write, due in large part to inferior segregated schools and the need to go to work in the fields at an early age, were refused their request to have someone help them mark their ballot, notwithstanding the Voting Rights Act's bar on literacy tests. In some instances, white poll workers loudly announced the African-American voter's inability to read or write, embarrassing the voter in front of his or her neighbors. When black voters said they could not see the ballot well, some white poll workers went so far as to give a magnifying glass to the African-American voters, challenging them to read using the magnifying glass in front of everyone present at the polling place. Illiterate white voters, on the other hand, were allowed assistance by a person of their choice without comment. Routinely, white

---

[3]  Names of individuals are included in the article but omitted here to avoid embarrassment to any individual.  Racial slurs also are edited out.

couples were allowed to enter the voting booth together to mark their ballots.

In those instances where African-American voters had an assistor in the booth, arbitrary rules were concocted that limited the number of voters an assistor could help, or made the assistor wait outside the polling place, requiring the voter to enter the polls alone and negotiate alone the sign-in procedures administered by unfriendly white poll workers, before being allowed to ask that the assistor be allowed to help.  All too often, when the voter said he or she needed assistance the white poll worker proceeded to help the voter, and did not give the voter a chance to ask for the assistor the voter wanted; the voter did not know if the poll worker cast the ballot as the voter desired, and had no confidence that the ballot was correctly cast….

A white voter waiting in line to vote stated to white poll official [*] that she was unable to obtain a yellow sample ballot distributed by the Alabama Democratic Conference.  The black voter standing next in line had such a ballot.  Mr. [*] stated, "You ain't [sic] of the right color."  During the same day, Mr. [*] stated to federal observer [*], "See, the n[****]rs bring in these yellow marked ballots. The n[****]r preachers run the n[****]rs down here, you know. They tell them how to vote. I don't think that's right."

Poll officials instructed white registered voters to confirm their registration status in the office of the Probate Judge.  Black voters whose names were not on the list were in each instance simply told that they could not vote, and were given no instruction by poll officials.  White voter [*]'s name did not appear on the list, and Ms. [*] acknowledged that she resided in a rural precinct and not in box 11-1 [Evergreen].  Ms. [*] nevertheless was allowed to vote an unchallenged ballot directly on the machine.

Ms. [*], who required assistance because of a vision problem, signed the poll list

and stated that she wished for her companion (unidentified) to provide assistance in voting for her.  White poll official [*] stated, "Can't nobody go in there with you." After a pause, Mr. [*] stated to Ms. [*], "you can fill out an affidavit and then she can go in with you. Can't you [read]?" Mr. [*]'s tone and manner were sufficiently abrasive that Ms. [*] left the voting place. Some moments later she was observed to remark to a companion, who was trying to persuade her to make another attempt to vote, "I've done had trouble with them twice before and I'm not begging them any more. I'm not scared but I'm not begging anybody." Ms. [*] returned accompanied by Mr. [*], at that time the Chair of the Conecuh county Branch of the Alabama Democratic Conference. Ms. [*] was allowed to vote, and the poll officials provided necessary assistance with the affidavit. Ms. [*] remained very upset and remarked, "Why couldn't they have let me vote to begin with?"

Ms. [*] enforced the limitation on the amount of time a voter could spend in the booth in a random and discriminatory fashion.  She enforced the limitation against black voters more frequently than against white voters. During the last hour of voting the requirement was applied exclusively against black persons.  On at least two occasions she told black voters that their time had elapsed when, in fact, it had not.

During the course of the day, poll officials addressed all black voters by their first names.  Older white voters were addressed by the courtesy titles of Mr. and Ms.

White poll official [*]initiated new procedures for assistance of black voters.  Without notice to any person, Mr. [*] required assistors accompanying voters into the polling place to remain 30 feet outside the polls until Mr. [*] had finished interviewing the voter and summoned the assistor.

Poll officials who assisted black voters did not read the ballot to the voters or

otherwise advice the voters of the contests and the candidates.  They simply asked the voters, "Who do you want to vote for?"

Poll official [*] marked the ballot for a voter she was assisting in contests in which the voter did not express a preference.

Poll officials frequently served as assistors without asking voters receiving assistance who they wanted to assist them. On a number of occasions, poll officials serving as assistors did not read the complete ballot to the voters.

30.  As found by this Court, the City of Evergreen violated Section 5 of the Voting Rights Act by enforcing the voting changes raised in this action. Doc. 8; Doc. 32. The process of adoption of those changes, moreover, was conducted without meaningful participation by the black community: there was no public notice or council authorization for the change in method of determining which city residents would be eligible to vote in the 2012 election and black citizens sought in vain changes in district boundaries which would give them a more equal opportunity to elect candidates of their choice. Doc. 23-1, 50-52.

31.  Defendants' submission of the plan on June 15, 2012 meant that the 60-day period for the Attorney General's Section 5 determination, 42 U.S.C. 1973c, would not occur until mid-August, or well after the deadline for numerous steps in the election process, including the deadline for candidates to qualify for council positions, Ala. Code §11-46-25(g) (1975). Despite the tardiness of Defendants' submission, Defendants did not request expedited consideration of the 2012 Plan. Doc. 23-1, 11-23. Defendants' submission also did not include information identified by the Attorney General in his redistricting guidance as important to the review of redistricting plans, including "public statements of members of the adopting body or other who may have played a significant role in the process, the historical background of the decision; …

16

the sequence of events leading up to the decision; ... whether the challenged decision departs, either procedurally or substantively, from the normal practice; and contemporaneous statements and viewpoints held by the decision-makers, elections history and voting patterns within the jurisdiction, voter registration and turnout information; plans that were actually considered or drawn by the submitting jurisdiction, as well as alternative plans presented or made known to the submitting jurisdiction by interested citizens." *Id.*

32.  These documents are identified as central to Section 5 review in the Attorney General's Guidance Concerning Redistricting Under Section 5, 76 F. Reg. Vol. 76 No. 27, pp. 7470-7473. Each of these items tracks the racial purpose analysis of *Village of Arlington Heights* v. *Metropolitan Housing Development Corp.,* 429 U.S. 252, 266-68 (1977).

33.  Subsequent to the filing of the complaint, On August 10, 2012 the Department of Justice sent a letter formally denying preclearance and identifying in detail the additional information necessary for Defendants to overcome evidence of racial discrimination in the adoption of the plan.  Doc. 23-1, 24-26.  Defendants failed to respond to the Department of Justice request for information establishing the absence of a discriminatory purpose and the three-judge Court enjoined further use of both the redistricting plan and the changed method of determining voter eligibility.  Doc. 32.

### III.  DISCUSSION AND CONCLUSIONS OF LAW

### A.  The Plaintiffs Are Entitled to Summary Judgment on Claims III and IV.

1.      "Summary judgment is appropriate when the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact." *Jean-Baptiste v. Gutierrez*, 627 F.3d 816, 820 (11th Cir. 2010). Here, there is no factual dispute about whether the City's actions violate the Constitution.  Under Fed. R. Civ. P. 56(a), summary

judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see* also *Eberhardt v. Waters*, 901 F.2d 1578, 1580 (11th Cir. 1990).   The party seeking summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.". *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)(quotation omitted).  Plaintiffs have met that burden.

1. **The City's 2012 Redistricting Plan was Adopted with a Racially Discriminatory Purpose and Violates the 14th Amendment**

2.     The undisputed facts set forth above establish a violation of the Constitution. Determining racial purpose involves a review of specific criteria within the framework of *Arlington Heights v. Metropolitan Housing Dev. Corp*., 429 U.S. 252 (1977).  It does not require a "window into men's souls" or a psychological examination.  Indeed, a determination that a plan was enacted with a racially discriminatory purpose does not necessitate a finding of racial animus.  As set forth in Judge Kozinski's concurrence in *Garza v. County of Los Angeles*, 918 F. 2d 763 (9th Cir. 1990).

> Assume you are an anglo homeowner who lives in an all-white neighborhood. Suppose, also, that you harbor no ill feelings toward minorities. Suppose further, however, that some of your neighbors persuade you that having an integrated neighborhood would lower property values and that you stand to lose a lot of money on your home. On the basis of that belief, you join a pact not to sell your house to minorities. Have you engaged in intentional racial and ethnic discrimination? Of course you have. Your personal

18

feelings toward minorities don't matter; what matters is that you intentionally took actions calculated to keep them out of your neighborhood.

*Garza and United States* v. *County of Los Angeles,* 918 F.2d 763, 778 n.1 (9th Cir. 1990) (Kozinski, J., concurring and dissenting in part), *cert. denied,* 498 U.S. 1028 (1991).

3.    In *Garza*, the Court rejected a defense that the redistricting plan enacted by the county Supervisors was not was "intended to perpetuate their own incumbencies" saying "[a]lthough the [district] court noted that while 'the Supervisors appear to have acted primarily on the political instinct of self-preservation,' the [district] court also found that they chose fragmentation of the Hispanic voting population as the avenue by which to achieve this self-preservation….The supervisors intended to create the very discriminatory result that occurred. That intent was coupled with the intent to preserve incumbencies, but the discrimination need not be the sole goal in order to be unlawful." 918 F. 2d at 768, 771.

4.    Consistent with the undisputed evidence presented to it, this Court already has held that: While over sixty-two percent (62%) of the City of Evergreen's population is black, and that black population of the city is concentrated so that three compact and contiguous districts with substantial black majorities easily can be drawn, the defendants' proposed plan would retain three districts with white voter registration majorities by over-concentrating ("packing") the bulk of the black population in two districts (4 and 5) that have black population majorities in excess of eighty-six percent (86%). The remainder of the black population concentration is scattered among districts 1, 2 and 3, all with white voting population majorities. Plaintiffs' evidence of the presence of indicia of discrimination, as outlined in *Village of Arlington Heights v. Metropolitan Housing Development Corp*, 429 U.S. 252, 266-68 (1977), is neither rebutted nor distinguished by

the defendants. Indeed, the defendants, in their responses to the current motion, have not

objected to the above factual conclusions.

Doc. 45, 2-3.

5.      The "non-exhaustive list of factors listed  in *Arlington Heights*, 429 U.S. at 267-268

illuminate the racial purpose underlying the City's actions.

6.      Here, the fact that he plan "bears more heavily" on black voters is illustrated by the

Court's plan, which contains three districts in which the black population is 65 percent or more

of the total.  Indeed, it would be odd indeed for a redistricting plan in the racially segregated,

62.4 percent black city not to have three such strong black majority districts. That the City's plan

promised that 35 percent of the population would control 60 percent of the council seats (and that

the adoption of a new system for determining who could vote in the municipal election would

ensure election of a white mayor) is not happenstance.  The City avoided the creation of a third

black district by packing and cracking the black population so as to maintain white control; and

by overpopulating district 5 by an extraordinary amount.

7.      The "historical background" in Evergreen is a long series of decisions that have

disadvantaged minorities.  The white leadership of the city and county has at every stage stood in

the way of equal access to the franchise, not only through discriminatory electoral systems, but

also through harassment and intimidation of black voters as recently as 2008.  As indicated by

the record number of certifications of successive Attorneys General, Evergreen's record of overt

discrimination stands out even in Alabama.

8.      The immediate "sequence of events" in Evergreen is illuminating.  The 2010 census

showed that Evergreen now had a substantial black majority in population, with obvious

electoral implications. The City (1) adopted a redistricting plan that maintained control of city

government by the 35 percent white minority and (2) implemented an illegal and highly

discriminatory system for determining who could vote in the 2012 municipal election.  The

City's redistricting fits the pattern of racial reaction in Evergreen.  Black citizens registered and

ran for office. and the election system was changed in 1971 to thwart equal black representation.

The unprecleared change was discovered and an objection interposed.  The federal court struck

down the existing districting and the white leadership proposed a new plan with no black

majority districts, again to thwart equal black representation.

9.      The "procedures for adoption" of the plan were marked by a number of statutory

violations.  The failure to make a record of the alternative plan(s) considered and discussed at the

"informal" meeting violated the Alabama Open Meetings Act of 2005, *see* Alabama Open

Meetings Act:  A Manual for Alabama Public Officials, pp. 9-10, 29.  Indeed the conduct of such

a meeting without public notice violated state law and would have violated state law even if it

had been an executive session of the council.[4] The city held no public hearings or publish the

proposed plan in the local newspaper for two consecutive weeks.  It drew the plan in the dark.

10.     The plan also departed from the state law "substantive requirement" for municipal

redistricting plans that "[e]ach district shall contain as nearly as is possible the same population."

Alabama Code 11-43A-97(b).  *Accord,* Alabama Code 11-40-8.  The districts adopted by the city

do not minimize population deviations and thus clearly violate the state law.

11.     As the Court has noted, the plan also departs from federal law standards, including the

equal representation requirements of Sections 2 and 5 of the Voting Rights Act.  The plan avoids

---

[4] Before any executive session, an Alabama Council must first go into public session and
publicly announce the executive session, publicly vote to enter executive session, publicly
announce the time at which it plans to reconvene, and publicly reconvene.  Id. at 20-21.

the third majority-black district that Section 2 standards mandate here, and invited a Section 2 lawsuit with the consequent financial burden on the city.

12.     The City also departed from legitimate interests in adopting a mal-apportioned plan.  The deviation among districts falls within a 10 percent range, but it falls outside the plus or minus five percent range that assures a balance among districts.  The impact of the mal-apportionment is to overpopulate the two black districts and to under-populate the white districts so as to deny equal representation to black voters.  The plan thus is unconstitutionally apportioned under *Larios v. Cox*, 300 F. Supp. 2d. 1320 (N.D. Ga. 2004) (one-person, one-vote violation in regional population imbalances in the plan even where deviation fell within the plus or minus five percent standard.)         .

13.     Here, the significance of the "legislative history" is that there is no legislative history. The city made no record of the key informal, work session at which the plan was discussed for the first time in a semi-public environment.  Given the City's history, the inferences to be drawn from the city's failure to make the legislative history required by law are telling.

14.     The evidence under the *Arlington Heights* framework thus is compelling. *Arlington Heights* was a housing discrimination case and, "do[es] not purport[] to be exhaustive" of types of evidence of racial purpose.  429 U.S. at 268.  In the redistricting context, the over-concentration and fragmentation – packing and cracking – of Evergreen's black population identified by the Court also show a discriminatory purpose.  Where, as in Evergreen, voting is racially polarized, one can manipulate district lines in order to dilute the voting strength of politically cohesive minority-group members. *Voinovich v. Quilter*, 507 U.S. 146, 153–54 (1993). This can be done either "by fragmenting the minority voters among several districts where a bloc-voting majority can routinely outvote them, or by packing them into one or a small

22

number of districts to minimize their influence in the districts next door." *Johnson v. De Grandy*, 512 U.S. 997, 1007 (1994).

15.     The court in *Major v. Treen*, 574 F.Supp. 325, 352-353 (E.D. LA. 1983) described the role of packing (here referred to as "stacking") and cracking black concentrations:

> Physical evidence of racial gerrymandering may itself furnish strong, objective proof of vote dilution.... Minority voting strength may be dissipated through one of two familiar gerrymandering techniques: "stacking," or the overconcentration of members of a specific group in numbers greatly in excess of the percentage required to exercise a meaningful choice at the ballot box, or "cracking," the division of a cohesive population concentration… .When a redistricting plan employs the latter technique in a racially polarized environment, the result is predictable.

16.     The "physical evidence" of intentional discrimination in the City's redistricting is apparent.  Districts 4 and 5 both are over 80 percent black in voting age population, or far more than necessary for black voters to enjoy an equal opportunity to elect candidates of their choice. The remaining black population is cracked among the white-controlled districts.  The 35 percent white population, by contrast, is spread with great efficiency to control 60 percent of the districts.

**2.     The City's 2012 System of Determining Voter Eligibility was Adopted with a Racially Discriminatory Purpose and Violates the 14th Amendment**

17.     The *Arlington Heights* analysis of the City's adoption of a new and bizarre method of determining which registered voters would be eligible to participate in the municipal election is, if anything, even more compelling.  The City's system for determining which Conecuh County voters would be eligible to participate in the municipal election defies state and federal law and ordinary common sense.  The list of customers of the municipal utility systems by its very nature

is both under-inclusive and over-inclusive.  Renters who do not pay their own utilities, including persons residing in public housing, are not listed.  In some cases spouses are not listed, nor are members of extended families and others sharing a house with the named utility customer.  On the other hand, such a list could include persons who own rental property within Evergreen but who live outside the city limits as eligible to vote in Evergreen elections – again, contrary to state law.  The City's eligibility determination scheme thus manages to undermine both the "fundamental" right of suffrage, Reynolds v. Sims, 377 U.S. 533, 561-562 (1964), and the "compelling interest in preserving the integrity of [the] election process." Purcell v. Gonzales, 549 U.S. 1, 4 (2006).

18.     The voter eligibility system was adopted under the *Arlington Heights* circumstances set forth above, and it is hard to imagine a purpose other than racial discrimination that would prompt such a choice.  The very labeling of the "Problem Voters" list is telling.  Defendants conceded the illegality of the system, Docs. 7, 8, and the need for a Special Master and participation by the plaintiffs in development of an accurate voter list and the conduct of the municipal election. Docs. 12, 13.  And they have not lifted a finger to defend it since.

   **B.  Plaintiffs are Entitled to Relief under Section 3 of the Voting Rights Act**

19.     Evergreen offers a prime example of why at least some pre-enforcement review under the Voting Rights Act is still necessary to vindicate the voting rights of black citizens. Evergreen has engaged in persistent and intentional efforts to diminish the voting strength of voters of color, and to exclude them from the political process. If ever a jurisdiction was deserving of being affirmatively subjected to the preclearance requirement under Section 3(c) of the Act, Evergreen is that jurisdiction.

20.     A Section 3(c) equitable remedy requiring the City of Evergreen to submit any mid-

census redistricting plan or change in the method of determining eligibility to vote in municipal

elections for preclearance review for a limited time period is appropriate, justified and required

by the Voting Rights Act. Unlike the Court's concerns with Section 4 and its outdated

application, Section 3(c) is not based on any predetermined formula—it is "justified by current

needs" and "is sufficiently related to the problem that it targets." *Nw. Austin v. Holder*, 557 U.S.

193, 203 (2009).  The facts of record in this case warrant application of this prophylactic remedy

to restrain Evergreen future mistreatment and political exclusion of its black citizens.

### 1.   Plaintiffs are Entitled to Relief under Section 3(a) of the Voting Rights Act

21.     Section 3(a) of the Voting Rights Act allows the Attorney General to assign federal

observers to monitor polling places in certain jurisdiction upon the Attorney General's

certification that such assignment is necessary to protect the 14th and 15th Amendment rights of

voters.  42 U.S.C.  1973a(a).[5]  Federal observers have been a regular feature of elections in

Evergreen, including most recently the 2013 special municipal election under the Attorney

General's authority under Section 8 of the Act, 42 U.S.C. 1973f, to assign observers to

jurisdictions covered under the Section 4 formula struck down in *Shelby County*.  Problems have

not been "few in number" 42 U.S.C. 1973a(a); indeed, as noted above, Evergreen and Conecuh

County have experienced more frequent federal observer coverage than any other jurisdiction in

Alabama pursuant to the formal certifications by successive Attorneys General that such

---

[5] The role of federal observers is described in detail in James Thomas Tucker, *The Power of Observation: The Role of Federal Observers Under the Voting Rights Act,* 13 Mich. J. Race & L. 227 (2007).  Federal observers are authorized to enter and attend the polling places.  The observers make a record of events in the polls and report information to one or more Department of Justice attorneys who, in turn, share information with local election officials to resolve problems as they occur. The presence of federal personnel inside the polls deters misconduct.

certification was necessary to protect the rights of black citizens.  There is no indication that the continuing need for such protections has disappeared.

22.    Section 3(a) coverage has been employed fairly frequently.  *See*, e.g., *United States v. Berks County*, 250 F.Supp. 2d 525, 543 (E.D. Pa. 2003).  Political subdivisions currently eligible for federal observers as a result of court orders under the Voting Rights Act include Alameda County, California; Colfax County, Nebraska;  Orange County and the Village of Port Chester (Westchester County), New York; and Cuyahoga and Lorain Counties, Ohio. http://www.justice.gov/crt/about/vot/examine/activ_exam.php.[6]

## 2.  **Plaintiffs are Entitled to Relief under Section 3(c) of the Voting Rights Act**

23.    Section 3(c) requires that upon finding that a jurisdiction has committed a constitutional violation,[7] a court shall, in addition to any equitable remedy imposed, retain jurisdiction for an appropriate time and require that the jurisdiction obtain preclearance from the court or the Attorney General for changes to designated voting practices.  Section 3(c) thus can focus directly on a specific class of problems.

24.    Section 3(c) is not a novel device.  It was part of the Act as originally enacted in 1965. Federal courts across the United States have entered orders under Section 3(c) requiring

---

[6] Additional jurisdictions in which Section 3(a) relief recently has been ordered but where it has expired include but are not limited to Boston, MA, http://www.justice.gov/crt/about/vot/sec_203/documents/boston_cd2.php;  Salem, NJ, http://www.justice.gov/crt/about/vot/sec_203/documents/pennsgrove_cd.php;  Springfield, MA, http://www.justice.gov/crt/about/vot/sec_203/documents/springfield_cd.php Hamtramck, MI, http://www.justice.gov/crt/about/vot/sec_2/hamtramck_cd04.pdf; Riverside County, CA, http://www.justice.gov/crt/about/vot/sec_203/documents/riverside_order.pdf; Walnut, CA, http://www.justice.gov/crt/about/vot/sec_203/documents/walnut_cd.php; and Kane County, IL http://www.justice.gov/crt/about/vot/sec_203/documents/kane_order.pdf, among others.

[7] Although Section 3(c) uses the plural term "violations" to describe the trigger, 42 U.S.C. 1973a(c), the provision is best read to require proof of only a single constitutional violation. *See* 1 U.S.C. § 1 ("In determining the meaning of any Act of Congress, unless the context indicates otherwise, . . . words importing the plural include the singular."); *see also McMillan v. Escambia Cnty.*, 559 F. Supp. 720, 728 (N.D. Fla. 1983) (Section 3(c) relief ordered on a single violation.)

jurisdictions to obtain preclearance of voting changes upon a finding of a constitutional violation in18 cases.[8]

25.     The most detailed judicial analysis of Section 3(c) occurred in *Jeffers v. Clinton*, 740 F. Supp. 585, 586 (E. D. Ark.1990), appeal dismissed, 498 U.S. 1129 (1991. The three-judge *Jeffers* panel held that Arkansas had committed a number of constitutional violations of the voting rights of its black citizens so that a preclearance remedy was warranted by the record of intentional discrimination. *Id.* at 586.   Recognizing that "authority is scant" when it comes to the standards for imposing preclearance under Section 3(c), *id.* at 600, the *Jeffers* court embarked on a thorough analysis of the statute, and concluded that a narrow and "crabbed" reading of the statutory language would be "inconsistent with its broad remedial purpose." *Id.* at 592.

26.     Plaintiffs' complaint in *Jeffers* alleged constitutional and Section 2 violations in the 1981 state legislative redistricting plan. *Id.* at 586. The *Jeffers* court rejected plaintiffs' constitutional challenges to the redistricting plan, i*d.* at 591, but received other evidence supporting their 3(c) request. *Id.* at 592. The court noted that at least two previous cases resulted in findings of other constitutional violations in the state. *Id.* at 592. The court also considered other potential constitutional violations identified by plaintiffs: (1) state laws that required a majority (rather

---

[8] *See Blackmoon v. Charles Mix Cnty.*, No. 05-CV-4017 (D.S.D. Dec. 4, 2007); *Kirkie v. Buffalo Cnty.*, No. 03-CV-3011 (D.S.D. Feb. 10, 2004); *United States v. Bernalillo Cnty.*, No. 93-156-BB/LCS (D.N.M. Apr. 22, 1998); *United States v. Alameda Cnty.*, No. C95-1266 (N.D. Cal. Jan. 22, 1996); *United States v. Cibola Cnty.*, No. 93-1134 (D.N.M. Apr. 21, 1994); *United States v. Socorro Cnty.*, No. 93-1244 (D.N.M. Apr. 11, 1994); *Garza v. Cnty. of Los Angeles*, No. 88-5143 (C.D. Cal. Apr. 25, 1991); *United States v. Sandoval Cnty.*, No. 88-1457 (D.N.M. May 17, 1990); *United States v. McKinley Cnty.*, 86-0029-C (D.N.M. Jan. 13, 1986); *Woodring v. Clarke*, No. 80-4569 (S.D. Ill. Oct. 31, 1983) (Alexander County); *McMillan v. Escambia Cnty.*, No. 77-0432 (N.D. Fla. Dec. 3, 1979); *United States v. Thurston Cnty.*, No. 78-0-380 (D. Neb. May 9, 1979); *United States v. Vill. of Port Chester*, No. 06-15173 (S.D.N.Y. Dec. 22, 2006); *Brown v. Bd. of Comm'rs*, No. CIV-1-87-388 (E.D. Tenn. Jan. 18, 1990) (City of Chattanooga); *Cuthair v. Montezuma-Cortez Sch. Dist. No. RE-1*, No. 89-C-964 (D. Col. Apr. 8, 1990); *NAACP v. Gadsden Cnty. Sch. Bd.*, 589 F. Supp. 953 (N.D. Fla. Mar. 6, 1984).

than plurality) vote for nomination or election to public office; and (2) local incidents in the state that were motivated by an intent to suppress black political activity. *Id.* at 592.

27.     On the variety of state laws requiring majority votes, the court concluded that it "cannot ignore the pattern formed by these enactments." *Id.* at 594. It further noted that "[t]his series of laws represents a systematic and deliberate attempt to reduce black political opportunity. Such an attempt is plainly unconstitutional." *Id.* at 595. The court in *Jeffers* rejected the defendants' arguments that other constitutional violations, not directly related to apportionment, were not pleaded in the complaint and were otherwise irrelevant to the 3(c) decision before the court. *Id.* at 591. The court found that from the outset, plaintiffs had tried to prove a pattern of violations that reduced the opportunity for black voters to participate in the political process, and defendants had a full and adequate opportunity to offer proof on all these issues. *Id.* The court specifically concluded that "[t]he phrase 'violations of the fourteenth or fifteenth amendment justifying equitable relief,' which the statute uses as the triggering condition for preclearance, is not limited at all." *Id.* at 592. The *Jeffers* court also concluded that local violations, in addition to state violations, of the voting guarantees of the 14th and 15th Amendments must be taken into account. Section 3(c), the *Jeffers* court observed, does not say that State officials must be guilty of the violations, but only that the violations must 'have occurred within the territory' of the State." *Id.* at 600. As such, the *Jeffers* court reviewed a number of examples offered by plaintiffs of local jurisdictions engaging in intentional racial discrimination in voting. *Id.* at 595-600. It found that there were constitutional violations in at least one of the counties used as illustrative by plaintiffs. *Id.* at 599. After considering the evidence of intentional discrimination, the *Jeffers* court entered a nuanced order under Section 3(c), retaining jurisdiction over the next (1991) state legislative redistricting plan and imposed a preclearance requirement for any state law having to

do with a majority-vote requirement in general elections, and left that requirement in place "until further order of this Court." *Id.* at 602.

28.     Prior to the *Shelby County* decision, the issue of Section 3 coverage did not arise in Alabama, but nothing in that decision suggests that a formerly covered jurisdiction could not be brought under the umbrella of Section 3 coverage.  Sections 3(a) and 3(c) alike apply in "any proceeding instituted by … an aggrieved person under any statute to enforce the voting guarantees of the fourteenth or fifteenth amendment in any state or political subdivision."

29.     The evidence before this Court clearly warrants the imposition of continuing the protections offered by federal observers in Evergreen elections as well as a focused Section 3(c) preclearance requirement on the City.  As to Section 3(a), there is a long record or discrimination against black citizens at the polls.  And Evergreen has a persistent record of erecting new barriers to every potential advance to black participation since black citizens were first enfranchised by the 1965 Voting Rights Act.

30.     The Court in *Shelby County* held in effect that Alabama should be subject to the same restrictions as other states, that Alabama should be treated like Massachusetts.  When faced with evidence of intentional discrimination in discrimination in voting, the court in Boston granted appropriate Section 3 relief.  This Court should do no less.

## IV.  CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that they be granted summary judgment as to Claims III and IV and  relief in the form of designation of the City of Evergreen pursuant to Sections 3(a) and 3(c) of the Voting Rights Act.

Dated:  August 1, 2013

Respectfully submitted,

*/s/John K. Tanner*
JOHN K. TANNER
3743 Military Road, NW
Washington, DC 20015
john.k.tanner@gmail.com
Admitted pro hac vice
Tel: 202-503-7696


*/s/Armardo W. Pitters*
ARMARDO W. PITTERS [8998-T64A]
P.O. Box 973
Montgomery, AL 36102
Tel: (334)265-3333
Fax: (334)365-3411
awpitters@pitterslawfirm.com

IN THE UNITED STATES DISTRICT COURT
FOR THESOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

|  |  |  |  |
|---|---|---|---|
| DAN ALLEN, et al., | ) | | |
| | ) | | |
| Plaintiffs, | ) | | |
| | ) | | |
| vs. | ) | Case Nos.:  1:13-cv-00107—CG-M | |
| | ) | | |
| CITY OF EVERGREEN, ALABAMA; | ) | | |
| et al., | ) | | |
| | ) | | |
| Defendants. | ) | | |

## PROPOSED ORDER

Plaintiffs brought this action on August 6, 2012 challenging both the current (2001) and proposed (2012) redistricting plans for Defendant under Sections 2 and 5 of the Voting Rights Act, 42 U.S.C. 1973 and 1973c, and the14th and 15th Amendments based on claims of racial discrimination and mal-apportionment. Plaintiffs also challenged the adoption by defendants of a new system for determining which registered voters were eligible to vote in elections of the City of Evergreen. Pursuant to joint motions of the parties, this Court enjoined the August 28, 2012 election and use of both the 2012 redistricting plan and the changed system of determining voter eligibility unless and until defendants obtained Section 5 preclearance, ordered a special election, and appointed a Special Master to oversee the development of an accurate list of eligible voters. Doc. 8, Doc. 13 and Doc. 32.

The plaintiffs have filed a motion for summary judgment on their constitutional claims and a concomitant motion seeking that the City of Evergreen should be subject to the requirements of Sections 3(a) and 3(c) of the voting Rights Act, 42 U.S.C. 1973a(a) and 1973a(c) through December 31, 2020.  Undergirding this motion is a motion for summary

judgment that the redistricting plan and the system for determining voter eligibility were adopted with a racially discriminatory purpose in violation of the 14th Amendment.

The Section 3 motion specifically asks that the Court designate the City of Evergreen pursuant to Section 3(a), 42 U.S.C. 1973a(a) of the Voting Rights Act to allow the Attorney General to assign federal observers to monitor Evergreen municipal elections.  Since 1980, the various Attorneys General have ordered the assignment of federal observers to monitor elections in Evergreen and Conecuh County on 14 separate occasions, more than in any other place in Alabama.  On each of these 14 occasions, the most recent of which was earlier this year, the Attorney General certified that the observer presence was necessary to protect the 14th and 15th amendment rights of black voters.

The designation with respect to Section 3(c) of the Act, 42 U.S.C. 1973a(c) would provide that this Court review two distinct types of voting changes by the City and for a limited period: any change in the redistricting plan or method of election for city council elections, and any change in the standards for determining which voters are eligible to participate in Evergreen municipal elections.  Application of Section 3 would be for a period of seven years, until December 31, 2010, i.e., though the 2006 and 2010 Evergreen municipal elections.

Each of these protections formerly was in place pursuant to Section 4 of the Voting Rights Act, 42 U.S.C. 1973b.  Under that formula, the entire State of Alabama was subject to the "special provisions" of the Voting Rights Act, including the assignment of federal observers and the "preclearance" review of all voting changes based on the State's use of discriminatory tests or devices and extraordinarily depressed voter registration and turnout in the 1964 presidential election.  The rest of the United States, those parts not captured by Section 4, faced an easier regime.  Other states, cities and counties could be subjected to the same "special provisions" of

federal oversight, but only upon a local district court's finding of one or more constitutional violations.  Upon such a finding, the district court could impose federal supervision through Section 3: federal election monitors under Section 3(a) and "preclearance" under Section 3(c).  Unlike Section 4, the Section 3 provisions applied equally to all states and localities.

The Supreme Court struck down the Section 4 formula in *Shelby County v. Holder*, 133 S.Ct. 2612 (2013).  The Court noted the extraordinary changes in minority political participation in Alabama and other states captured by the Section 4 formula. 133 S.Ct. at 2626.  Indeed, black voter registration and turnout rates in Alabama ware now favorable to those in Massachusetts. *Shelby County v. Holder*, 679 F.3d 848, 891 (U.S. App D.C. 2012) (Williams, J. dissenting). The Court accordingly determined that it no longer served as a sound basis for determining to which states and local governments the special provisions should apply. 133 S.Ct. 2630-31. In essence, the Court placed Evergreen on the same plane as Boston or Los Angeles.

Boston and Los Angeles both have been subjected to Section 3 coverage.  Boston was covered under Section 3(a) for a period of – years following a complaint in which the United State alleged, *inter alia*, that the City had violated the law by

Treating limited English proficient Hispanic and Asian American voters disrespectfully;

Refusing to permit limited English proficient Hispanic and Asian American voters to be assisted by an assistor of their choice;

Improperly influencing, coercing or ignoring the ballot choices of limited English proficient Hispanic and Asian American voters;

Failing to make available bilingual personnel to provide effectively assistance and information needed by minority language voters; and

Refusing or failing to provide provisional ballots to limited English proficient Hispanic and Asian American voters.

*United States v. City of Boston*, CIVIL ACTION No. 05-11598 WGY (D. Mass October 18, 2005). Los Angeles County was subjected to Section 3(c) coverage, *Garza v. Cnty. of Los Angeles*, No. 88-5143 (C.D. Cal. Apr. 25, 1991), following a finding that the County intentionally discriminated against Hispanic voters in drawing its redistricting plan for its Board of Supervisors intention. *Garza v. County of Los Angeles*, 918 F. 2d 763 (9th Cir. 1990).

The record in this case establishes clearly that the City of Evergreen by its actions warrants designation under both Section 3(a) and Section 3(c). As the Court already has found,

While over sixty-two percent (62%) of the City of Evergreen's population is black, and that black population of the city is concentrated so that three compact and contiguous districts with substantial black majorities easily can be drawn, the defendants' proposed plan would retain three districts with white voter registration majorities by over-concentrating ("packing") the bulk of the black population in two districts (4 and 5) that have black population majorities in excess of eighty-six percent (86%). The remainder of the black population concentration is scattered among districts 1, 2 and 3, all with white voting population majorities. Plaintiffs' evidence of the presence of indicia of discrimination, as outlined in *Village of Arlington Heights v. Metropolitan Housing Development Corp*, 429 U.S. 252, 266-68 (1977), is neither rebutted nor distinguished by the defendants. Indeed, the defendants, in their responses to the current motion, have not objected to the above factual conclusions.

Doc. 25, 23.

The City adopted a system for determining which voters would be eligible to participate in the municipal election that defied state and federal law and ordinary common sense.  Because precincts in Conecuh County, as in other areas of Alabama, include both incorporated and unincorporated areas, city clerks must perform the simple ministerial task of determining which registered voters have city addresses and include all such voters on the list of persons eligible to vote in city elections.  Evergreen instead created a list of eligible voters based on the billing list of customers of the municipal utility systems, and placed all other voters on a list it denominated "Problem Voters."  The Problem Voters disproportionately were minority citizens, and some minority voters were left off the voter list entirely based on rumor and supposition.

By its very nature, of course, the municipal utility billing list is both under-inclusive and over-inclusive.  Renters who do not pay their own utilities, including persons residing in public housing, are not listed.  In some cases spouses are not listed, nor are members of extended families and others sharing a house with the named utility customer.  On the other hand, such a list could include persons who own rental property within Evergreen but who live outside the city limits as eligible to vote in Evergreen elections – again, contrary to state law.  The City's eligibility determination scheme thus manages to undermine both the "fundamental" right of suffrage, *Reynolds v. Sims*, 377 U.S. 533, 561-562 (1964), and the "compelling interest in preserving the integrity of [the] election process." *Purcell v. Gonzales*, 549U.S. 1, 4 (2006).

"Summary judgment is appropriate when the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact." *Jean-Baptiste v. Gutierrez*, 627 F.3d 816, 820 (11th Cir. 2010).  Under Fed. R. Civ. P. 56(a), summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any

material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see* also *Eberhardt v. Waters*, 901 F.2d 1578, 1580 (11th Cir. 1990).   The party seeking summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.". *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)(quotation omitted).

Plaintiffs have met that burden.  The Court carefully has reviewed the evidence under the *Arlington Heights* framework: the impact of the decision, its historical background, the sequence of events, and the departures from considerations normally considered important by the decision-maker.  The Court also notes the "[p]hysical evidence of racial gerrymandering," *Major v. Treen*, 574 F.Supp. 325, 352-353 (E.D. LA. 1983).  The compelling evidence of intentional discrimination remains un-rebutted, and plaintiffs are entitled to summary judgment.

The Court further finds that the tailored Section 3 relief is appropriate.  The record of numerous and continuing certifications by successive Attorneys General shows a continuing justification for federal monitoring of Evergreen elections; and there is no question of the justification for review of any changes in the city's system for election city council members or for determining which Conecuh County voters are eligible to participate in Evergreen elections for the limited period requested by plaintiffs, through the 2010 municipal elections.  Accordingly, it is hereby ORDERED, ADJUDGED, AND DECREED that:

1.  Plaintiffs' Motion for Summary Judgment on Claims 3 and 4 of the complaint in this action is hereby GRANTED;

2. Plaintiffs' Motion for Relief under Section 3 of the Voting Rights Act is hereby GRANTED to the full extent that:

    a. The appointment of federal observers to monitor elections of the City of Evergreen is hereby authorized pursuant to Section 3(a) of the Voting Rights act, 42 U.S.C. 1973a(a) for a period ending December 31, 2010;

    b. No change in the method of electing the Evergreen City Council, including any change in city council district boundaries shall be enforced or administered unless and until the City satisfies the preclearance requirements of Section 3(c) of the Voting Rights Act, 42 U.S.C> 1973a(c)  for a period ending December 31, 2010;

    c. No change in the method of determining which registered voters are eligible to participate in elections of the City of Evergreen shall be enforced or administered unless and until the City satisfies the preclearance requirements of Section 3© of the Voting Rights Act, 42 U.S.C> 1973a(c)  for a period ending December 31, 2010;

3. The Court shall retain jurisdiction for a period ending December 31, 2010 to enforce this Order.

DONE and ORDERED this the ___ day of _____, 2013.


                             _____

                             UNITED STATES DISTRICT JUDGE

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 1st day of August, 2013, I served a copy of plaintiffs' Motion for Summary Judgment and Motion for Relief under Section 3 of the Voting Rights Act and the accompanying Memorandum of Points and Authorities and a Proposed Order to counsel for the parties by email and transmitted these documents to the Clerk for filing in the Federal Court ECF system.

*/s/John K. Tanner*_____
JOHN K. TANNER