IN THE UNITED STATES DISTRICT COURT
FOR THESOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| DAN ALLEN, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | Case Nos.:  1:13-cv-00107—CG-M |
| | ) | |
| CITY OF EVERGREEN, ALABAMA; | ) | |
| et al., | ) | |
| | ) | |
| Defendants. | ) | |

**REPLY TO DEFENDANTS' RESPONSE TO MOTION FOR SUMMARY
JUDGMENT AND MOTION FOR RELIEF UNDER
SECTION 3 OF THE VOTING RIGHTS ACT AND
RESPONSE TO MOTION TO DISMISS**

Plaintiffs respectfully submit this reply to defendants' opposition to plaintiffs' motion for summary judgment and for relief under Sections 3(a) and 3(c) of the Voting Rights Act.  As discussed below, defendants' opposition is not supported by any affidavits or other evidence as required by Rule 56, Fed. R. Civ. Pro. Section 3(c) relief is warranted in this case because existing evidence establishes intentional voting discrimination and other proceedings provide overwhelming evidence of constitutional violations in and by the defendants.  Further, as set forth below, plaintiffs' claims are by no means moot, as the pending request for Section 3 relief makes plain. The plaintiffs' requests for relief under Sections 3(a) and 3(c) makes challenges to the 2012 redistricting plan and method of determining voter eligibility live controversies under Article III of the United States Constitution.

It is axiomatic that a case "becomes moot only when it is impossible for a court to grant any effectual relief whatever to the prevailing party." *Chafin v. Chafin*, 133 S. Ct. 1017, 1023

(2013) (internal quotation marks and citations omitted).  K*nox v. Serv. Emps. Int'l Union, Local 1000*, 132 S. Ct. 2277, 2287 (2012) ("A case becomes moot only when it is impossible for a court to grant 'any effectual relief whatever' to the prevailing 'party.'")   A case is not moot if the court can grant even a "partial remedy.")  *Church of Scientology of Cal. v. United States*, 506 U.S. 9, 13 (1992); *see also, e.g.*, *Reno v. Bossier Parish Sch. Bd.*, 528 U.S. 320, 327-28 (2000) (holding that a preclearance action under Section 5 of the Voting Rights Act was not moot even though the districts at issue would not be used in any future elections); *United States v. McLeod*, 385 F.2d 734, 752-53 (5th Cir. 1967) (holding that the "mere cessation of unlawful activity" concerning minority voting rights does not "render a case moot" when additional remedies are available).

Two cases have addressed the issue of mootness of a request for Section 3 relief in the context of a redistricting plan that is no longer operative.  In *Blackmoon v. Charles Mix County*, 505 F. Supp. 2d 585 (D.S.D. 2007), the court addressed closely analogous circumstances regarding Section 3 of the Voting Rights Act.  After modifying the jurisdiction's redistricting plan to remedy a successful malapportionment claim, the court denied a defendant jurisdiction's motion to dismiss as moot plaintiffs' claims that the prior redistricting plan was racially discriminatory. 505 F. Supp.2d at 592-593. The court concluded that if plaintiffs prevailed on their race discrimination claim, they might be entitled to relief under Section 3 of the Voting Rights Act, and the possibility of further relief precluded mootness. I*d.*  The court subsequently designated Charles Mix County pursuant to Sections 3(a) and 3(c), *Blackmoon v. Charles Mix County*, No. 05-CV-4017 (D.S.D. Dec. 4, 2007) and, indeed, on February 11, 2008, the Attorney General interposed an objection to a change affecting county commission elections. http://www.justice.gov/crt/about/vot/sec_5/ltr/l_021108.php.

Most recently, the three-judge court in *Perez v. Perry,* Case 5:11-cv-00360-OLG-JES-XR (W.D. Tex. August 6, 2013), doc. 886 at 14-15, refused to dismiss as moot claims for Section 3(c) relief based on intentional discrimination in its 2011 House, senate and Congressional redistricting plans.  Texas argued that its adoption in 2013 of new House, Senate and Congressional redistricting plans rendered claims based on the 2011 plans moot.  The court determined, however, that

> there is no indication or assurance that, in the next redistricting cycle, the Texas Legislature will not engage in the same alleged conduct that Plaintiffs assert violated their rights, including removing economic engines from minority districts, dismantling coalitions, manipulating voter turnout among Hispanics, or engaging in other conduct that Plaintiffs allege violated their rights in connection with the 2011 plans,

Id. at 14.  The court further held that

> Although the State vigorously opposes the availability of § 3(c) relief, Plaintiffs' claim for § 3(c) relief is certainly not so implausible that it is insufficient to preserve jurisdiction. *See Chafin v. Chafin*, ___ U.S. ___, ___, 133 S. Ct. 1017, 1026-27 (2013) (holding that uncertainty as to relief does not render a case moot and even availability of a partial remedy is sufficient to prevent a case from being moot).

Id at 15.

Whether Section 3 relief should be ordered as a result of the state's legislative actions creating the 2011 plans is a current, disputed matter before the Court. "Because [the Court] can order relief in this case," *Willy v. Administrative Review Bd.*, 423 F.3d 483, 494 n.50 (5th Cir. 2005), plaintiffs' claims of intentional racial discrimination by the City of Evergreen in its adoption of the2012 redistricting plan and the 2012 procedure for determining which registered voters would be allowed to cast ballots in the Evergreen municipal election are not moot.

## I.   Facts establish that the redistricting plan and the method of identifying eligible voters were adopted with a racially discriminatory purpose remain undisputed.

"Once the motion for summary judgment is made and supported, it places an affirmative burden on the non-moving party to go beyond the pleadings and 'by affidavit or otherwise'

3

designate 'specific facts showing that there is a genuine issue for trial.'" *Commercial Union Ins. Co. v. Schmidt,* 967 F.2d 270, 271 (8th Cir.1992), citing *Robinson v. Monaghan,* 864 F.2d at 624 (quoting Fed.R.Civ.P. 56(e)); *Celotex Corp. v. Catrett,* 477 U.S. 317, 324 (1986).  Plaintiffs have presented detailed evidence sufficient to establish a constitutional violation. Doc. 65-1.  As discussed below, defendants have failed "to go beyond the pleadings and 'by affidavit or otherwise' designate 'specific facts showing that there is a genuine issue for trial.'"  *Id.*

### A.  The 2012 redistricting plan

Defendants offer no affidavits or other evidence to refute plaintiffs' evidence that the 2012 redistricting plan was adopted with a racially discriminatory purpose. Doc. 65-1 at 6-20. Defendants at this writing have failed even to answer the initial compliant in this matter, doc. 1, despite an invitation from the Court.  Doc. 62.  In their response to plaintiffs' motion, defendants have presented no affidavits or other evidence that the 2012 redistricting plan would not bear more heavily on black citizens and result in their under-representations or to explain or justify such discriminatory effect.  Doc. 67.  Defendants have presented no affidavits or other to rebut or explain the considerable evidence that the adoption of the 2012 plan was marked by procedural departures, by departures from considerations normally considered important by decision-makers, the exclusion of black citizens from the decision-making process, the departures from state law in the plan, the violations of federal law in the implementation of the plan, the packing of the City's concentrated black population into two districts and the fragmentation of the remainder among majority white districts so as to prevent a third district with an effective black majority.  *Id.*  It thus remains today, six months after the Court so found on March 20, 2013, that "Plaintiffs' evidence of the presence of indicia of discrimination, as outlined in *Village of Arlington Heights v. Metropolitan Housing Development Corp*, 429 U.S. 252, 266-68 (1977), is

neither rebutted nor distinguished by the defendants." Doc. 45 at 3.   Nor do defendants offer affidavits or other evidence to rebut the evidence of racial purpose under the framework of *Rogers v. Lodge*, 458 U.S. 613, 617-20 (1982).

Rather than present evidence, defendants claim that their alleged efforts to reach a settlement on a new redistricting plan as evidence that they lacked a discriminatory intent.  Doc. 67 at 9-10.  Defendants have produced no supporting affidavits or evidence, *id.*, and the facts of record establish that defendants in fact never made a good faith effort to reach agreement on a settlement plan.  Doc. 36 at 4-5.  Defendants never adopted a settlement proposal; indeed, a majority of the defendants never even bothered to attend settlement meetings with their own counsel.  *Id.  See also* doc. 40.  Tellingly, settlement failed when defendants backed away from a commitment to provide for a third council district with a substantial black majority. Doc 36 at 5, doc. 33 at 2.  Defendants all too appropriately cite from *Jeffers v. Clinton,* 740 F. Supp at.590 to the effect that "that one political party will often automatically oppose what another one proposes, and we think this factor accounted for much of what happened here."  Doc. 67 at 9-10. There are no political parties here: municipal elections are nonpartisan and it is uncontroverted that the division in Evergreen is entirely along racial lines.[1]  No affidavit or evidenced of record identifies any other point of contention in Evergreen.  It is race, not political party that accounts for defendants' redistricting decisions.

Defendants attempt to separate and discount items in the historical background of the 2012 voting decisions by the City that reflect events of the 1980s as well as in the 2000s and

---

[1]  It is undisputed that racial polarization in Evergreen ignores party labels: white Democratic candidates regularly carry white majority precincts, while white voters always oppose black candidates.  Doc. 23-1 at 31-44, 53-56.

2010s.[2]  Doc. 67 at 10-12.  That evidence of record shows a long-standing pattern in which the white community in Evergreen has met every advance of black voting rights with a new barrier; thus the recrudescence of discriminatory practices as the black community approached a substantial majority of the Evergreen population.  The Supreme Court repeatedly has upheld the relevance of "[t]he historical background of the legislative decision … particularly if it reveals a series of official actions taken for invidious purposes."  *Arlington Heights*, 429 U.S.  at 267; *Rogers v. Lodge*, 458 U.S. 613*, (1982)* ("Evidence of historical discrimination is relevant to drawing an inference of purposeful discrimination, particularly in cases such as this one where the evidence shows that discriminatory practices were commonly utilized, that they were abandoned when enjoined by the courts or made illegal by civil rights legislation, and that they were replaced by practices which, though neutral on their face serve to maintain the status quo.") See also *Busbee v Smith*, 594 F. Supp.. 494, 499 (D.D.C. 1983) (Noting that "literacy tests, the poll tax, the white primary and the county unit system were employed to destroy black voting strength.")  In *Jeffers v. Clinton*, 740 F. Supp. 585 (E.D. Ark. 1990), the three-judge court certified the State of Arkansas for Section 3(c) coverage based in part on intentional

---

[2]  Defendants raise an objection to evidence doc. 67 at 10 n. 5, from a law review article first cited by plaintiffs on December 12, 2012.  The article is by a former Deputy Chief of the Voting Section of the Justice Department drawn from direct observations of federal observers as set forth in court papers in case over which he had responsibility and which citations, presumably, checked by the law review staff.  See also *The Voting Rights act: Sections 6, 7 and 8 – The Federal Examiner and Observer Program: Hearing Before the Subcomm. On the constitution, H. Comm. On the Judiciary*, 109th Cong. (2005) (statement of Barry H. Weinberg).  That evidence accordingly (1) has equivalent circumstantial guarantees of trustworthiness; (2) it is offered as evidence of a material fact; (3) it is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts; and (4) admitting it will best serve the purposes of the Federal Rules of Evidence and the interests of justice.  Fed. R. Evid., Rule 807.

discrimination in 1973 and in a 1974 report of discriminatory practice.  740 F. Supp. at 594, 596.[3]

Defendants present no affidavits or other evidence to counter the abundant evidence of race-based harassment and intimidation of black voters at the polls in Conecuh County as recently as this year.  Instead, defendants suggest that the various Attorney Generals' decisions to assign federal observers to monitor elections in Evergreen have been lightly made.  In fact, the Attorney General's interpretation of the requirements of the Voting Rights Act is entitled to considerable deference. *See, e.g., Perkins v. Matthews,* 400 U.S. 379, 390-94 (1971); *United States v. Sheffield Board of Commissioners,* 435 U.S. 110, 134, (1978).  The assignment of federal observers, moreover, can only be made where the attorney General is convinced that such assignment is necessary to protect the 14th and 15th amendment rights of minority voters – the right to be free from intentional discrimination – as a matter of federal law.  42 U.S.C. §1973a. That determination must be made personally by the Attorney General: there is no delegation to any other officer of the United States similar to the delegation of authority to interpose objections under Section 5 to an Assistant Attorney General.  Procedures for the Administration of Section 5 of the Voting Rights Act of 1965, as amended, 28 CFR Ch. 1, Section 51.3.  There is no basis for defendants' unsupported suggestion that successive Attorneys General have abused this responsibility.  Defendants fail even to suggest that such assignment has caused any

---

[3]  Nothing in *Shelby County v. Holder*, 133 S. Ct. 2612, 2619 (2013), is to the contrary.  That case held only that the coverage formula in Section 4(b) of the Voting Rights Act as reauthorized in 2006 is unconstitutional and "can no longer be used as a basis for subjecting jurisdictions to preclearance" under Section 5 of the Act. 133 S. Ct. at 2631. The Court concluded that the coverage formula based on long-banned voting tests and devices and outdated voter participation data could no longer "makes sense in light of current conditions," *id.* at 2629, but the Court indicated specifically that it was issuing "no holding on [Section] 5 itself, only on the coverage formula," *id.* at 2631.  The Court did not address Section 3, nor did it change the *Arlington Heights* or *Rogers v. Lodge* frameworks for identifying intentional discrimination.

inconvenience or that they have taken advantage of the administrative opportunity to terminate the certification for federal observers, 42 U.S.C. §1973k, as they would have done had they thought the authority had been abused.

## B.  Method of determining voter eligibility

Defendants have presented no affidavits or other evidence concerning the adoption of a new system for determining voter eligibility in Evergreen.  Doc. 67.  Defendants do not dispute that the system adopted by the City of Evergreen for determining which registered voters would be eligible to participate in the 2012 election was unprecedented, that it was illegal under state law, or that it was enforced in violation of federal law.  *Id*.  Defendants have not disputed that the procedure was irrational. Defendants have not disputed that the new system was racially discriminatory in its impact.  *Id*.

Defendants instead aver that the old voter list (that used in 2008) had been destroyed and that the city proceeded from "an understandable lack of knowledge."  The claim that the 2008 voter list was destroyed is unsupported by any affidavit or other admissible evidence of record in this case.[4]  There is no allegation, moreover, that the copies of the previous municipal voter list published in the Evergreen Courant, the local "newspaper of general circulation" Ala. Code §§11-46-36, 11-46-107, also were destroyed or that no other copy of the list was available.  *Id*.

In any event, the existence of an earlier voting list is neither here nor there.  The 2008 voter list, infected as it was by four years of voter registration changes, was no longer valid. Alabama has a single, centrally maintained statewide voter list maintained by the Secretary of

---

[4]  Counsel for defendants, Mr. Anderson, made a statement during the January 28, 2013 hearing before the three-judge court in this matter that the list had been lost or destroyed, but no support for that non-evidentiary statement has been made available to plaintiffs and plaintiffs are unaware of any such evidence.  In the absence of such evidence the court should reject the suggestion.

State as chief elections officer, and it is the only valid voter registration list.  42 U.S.C. §15483; Ala. Code §17 -4-33.  The Alabama code requires the mayor "to cause to be made a list of the qualified voters in the city" and in doing so "shall have full access to all registration lists of the county" and "shall have such lists compared with the official list of electors…on file in the probate office of the county in which the municipality is situated." [5]  Ala. Code §§11-46-36 and 11-46-107.  The authoritative list of eligible voters was at hand and the city simply needed to follow past practice and assign voters based on their addresses of record on the copy of the statewide list maintained in the county courthouse.

Defendants have failed, moreover, to offer any affidavits or other evidence to support their claim that responsible officials had a "lack of knowledge" as to how to develop an accurate voter list for the city.  Doc. 67.  That claim, moreover, is not credible. The proper procedures for creating a municipal voting list were available in the state code and from knowledgeable individuals in the office of the Secretary of State, the Alabama League of Municipalities, clerks in neighboring cities, and former clerks and other municipal officials and knowledgeable citizens in Evergreen and across Alabama.  Further, defendants offer no affidavit or other evidence explaining how the mayor and clerk chose to invent their bizarre and counterintuitive system for determining voter eligibility.  *Id*.  Nor do defendants explain why they did not immediately abandon the system or contact the city's attorney or other person when they saw that they were classifying nearly half of the Conecuh County registered voters who reside in heavily black districts as "Problem Voters."  *Id*.  The decisions of the City remain unexplained and irrational. In the context of the history of racial polarization and discrimination in the City of Evergreen,

---

[5]  The claim that "the Board of Registrars has never produced a City of Evergreen specific voter list since they had no designation for city voters" thus is irrelevant: it is not the responsibility of the Board of Registrars to produce a voter list for the city.

the "threat" of an emerging black majority, and the City's systematic violation of the Voting

Rights Act, the lack of knowledge is "understandable" only as a deliberate effort to limit black

voter turnout.

II.     **Undisputed facts establish a continuing need for  review of voting practices for a
        limited period and for the Attorney General to be able to assign federal
        observers to monitor Evergreen elections**

        Imposing a preclearance requirement for voting changes is warranted when there is a

demonstrated history of intentional discrimination and the potential for backsliding through

creative changes in voting procedures. *Cf. South Carolina v. Katzenbach*, 383 U.S. 301, 328

(1966) (describing preclearance as "shift[ing] the advantage of time and inertia from the

perpetrators of the evil to its victims."); H.R. Rep. 94-196, at 57-58 (1975) (describing

preclearance as a remedy "to a common practice in some jurisdictions of staying one step ahead

of the federal courts by passing new discriminatory voting laws as soon as the old ones had been

struck down"). The duration of the preclearance remedy is subject to the court's discretion. *See*

42 U.S.C. § 1973a(c) (providing that the court "shall retain jurisdiction for such period as it may

deem appropriate").  Here, contrary to defendants' suggestion, doc. 67 at 12, plaintiffs have

established multiple violations of black voters' constitutional rights in the 2012 redistricting

plan, in the 2012 change in method of determining voter eligibility, and in the repeated violations

of the rights of black voters at the polls.[6]  The request for Section 3 relied is, moreover, for a

limited period and for a narrowly tailored class of voting changes: the specific types of changes

as to which intentional discrimination has been shown.

---

[6]  In NAACP v. Gadsden County, 589 F. Supp. 953 (N.D. Fla. 1984), the court imposed Section
3(c) relief based on a single act (adoption of an at-large election system.)  *See also, e.g.,*
*McMillan v. Escambia Cnty.*, No. 77- 0432 (N.D. Fla. Dec. 3, 1979), and *Garza v. Cnty. of Los*
*Angeles*, No. 88- 5143 (C.D. Cal. Apr. 25, 1991).

The undisputed facts also demonstrate a need to authorize the Attorney General to assign federal observers to monitor Evergreen municipal election where, in the Attorney General's judgment, such assignment is necessary to protect the rights of voters against further violations of their constitutional rights.  The past record of such assignment – the most frequent in all of Alabama – shows a continuing need for a federal presence.  That need is underlined by the racial tension exhibited in the defendants' actions.

## CONCLUSION

For the foregoing reasons, the plaintiffs respectfully urge the Court to grant summary judgment on plaintiffs' constitutional claims and grant plaintiffs' motion for relief under Sections 3(a) and 3(c) of the Voting Rights Act.  Plaintiffs further respectfully urge the Court to reject defendants' motion to dismiss the claims as moot.

Respectfully submitted, September 10, 2013

/s/John K. Tanner
JOHN K. TANNER
3743 Military Road, NW
Washington, DC 20015
john.k.tanner@gmail.com
Admitted pro hac vice
Tel: 202-503-7696

/s/Armardo W. Pitters
ARMARDO W. PITTERS [8998-T64A]
P.O. Box 973
Montgomery, AL 36102
Tel: (334)265-3333
Fax: (334)365-3411
awpitters@pitterslawfirm.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 10th day of September, 2013, I served a copy of plaintiffs' Reply to Defendants' Response to Motion for Summary Judgment and Motion for Relief under Section 3 of the Voting Rights Act and Response to Motion to Dismiss to counsel for the parties by email and transmitted these documents to the Clerk for filing in the Federal Court ECF system.

*/s/John K. Tanner*
JOHN K. TANNER